Barbara **COLEMAN**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, and the Raytheon Employees' Disability Trust.**

Civ. A. No. 95–0253B.

United States District Court, D. Rhode Island.

March 26, 1996.

**574**

Karen L. Davidson, Providence, RI, for Plaintiff.

Benjamin V. White, III, Brooks R. Magratten, Vetter & White, Providence, RI, for Defendant.

## *OPINION*

FRANCIS J. BOYLE, Senior District Judge.

Plaintiff brings this action under the Employee Retirement Income Security Act of 1974 (ERISA) § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Plaintiff alleges a wrongful termination of long-term disability benefits under a plan administered by the defendant, Metropolitan Life Insurance Company. There are two issues that must be decided. First, the standard to be used to review the denial of benefits must be determined. Secondly, using the appropriate standard of review, it must then be determined whether the plaintiff was wrongfully denied payment of benefits.

## I. BACKGROUND

Plaintiff was an employee of the Raytheon Company ("Raytheon"), and, as such, was a participant in the Raytheon Employees' Long–Term Disability Benefit Plan (the "Plan"). The defendant Metropolitan Life Insurance Company ("MetLife") has served as the administrator of the Plan since mid–1982. Prior to that time, the Plan was administered by John Hancock Insurance Company ("Hancock"), and was funded by a group insurance policy issued by Hancock. In mid–1982, Raytheon decided to change the Plan's funding arrangements and claims administration, and entered into an agreement with MetLife. Under this arrangement, Raytheon employees paid a monthly sum into the Raytheon Employees Disability Trust (the "Trust") which was to be used to fund all claims under the Plan. MetLife was to administer the Plan, as well as provide "Limited Liability" insurance.

The Limited Liability Provision provided that MetLife would insure claims only during the calendar year in which they were filed. That is, if the Trust were unable to pay benefits as of a particular date, MetLife would pay on claims filed within that calendar year only. At the end of the calendar year in which a claim was filed, any future benefits were required to be funded by the Trust only. This Limited Liability Provision was in effect from 1982 through the end of 1993.

Plaintiff filed a long-term disability claim with MetLife in September of 1992. She was paid benefits from November 19, 1992 through August 31, 1993. Plaintiff's benefits were then terminated by MetLife as of September 1, 1993. At all times that benefits were paid to the plaintiff, even during the first calendar year, they were paid from Trust funds only. The specific facts of this case follow.

In November of 1991, plaintiff was employed by Raytheon as a Program Control Administrator. According to Raytheon, the position of Program Control Administrator requires sitting, fine visual auditory attention and precise verbal/written communication 61–100% of the day; standing, walking, and

highly repetitive motion 20–60% of the day; and climbing (stairs/ladder/scaffold), extended reaching (forward/overhead), pushing/pulling/twisting and bending/stooping/squatting 1–19% of the day.

On November 21, 1991, plaintiff was involved in a motor vehicle accident and was injured. Following the accident, plaintiff was out of work until April of 1992 when she returned to work at Raytheon and continued in her capacity as Program Control Administrator until three and a half months later on August 14, 1992 when she left work due to back pain. On August 28, 1992, plaintiff completed an application for benefits under the Plan. In the application, plaintiff stated that she was totally disabled as a result of the November 21, 1991 motor vehicle accident.

The application was submitted to MetLife along with an Attending Physicians Statement signed by Dr. Randy Kozel on September 5, 1992. Dr. Kozel's statement indicated that plaintiff had "persistent mid-back pain and muscle spasm" with objective findings of "tender, hard (spasm) muscles left thoracic paraspinal region, x-rays normal."

On October 29, 1992, MetLife wrote plaintiff acknowledging receipt of her claim, and told her it was requesting additional medical information from Dr. Kozel, as well as, information regarding her position of employment from Raytheon. On November 6, 1992, MetLife wrote another of plaintiff's treating physicians, Dr. Dale Drennan, requesting "a narrative report on her condition, focusing on the important points of her medical history, physical findings, and test results." In December of 1992, MetLife received a report dated September 8, 1992 from Dr. Drennan which included the following findings:

*Physical Examination:* Patient holds herself in an extremely guarded manner. She is seen today with very protracted shoulders and a kyphotic posture. She appears to me to be upset and frequently when speaking of the frustration and her concern about her job, she was noted to be crying. The patient has full range of motion of her cervical and lumbar spines. She has tenderness to palpation over the lower rhomboids on the left with a slight prominence noted there. She is also tender on the right however and no prominence is noted. The patient has no discomfort with rotational movements of the spine. She has no evidence of any weakness today. This is both in the upper and lower extremities. She is able to heel and toe walk and balance for ten seconds on either foot without difficulty. Her tandem walking is normal. Her enhanced Rhomberg's test is negative. Patient's reflexes are 2+ and equal throughout and her Babinski's are downgoing. Her sensory examination is normal. Observing the patient move as noted, there was some hesitancy, however no movements were restricted. Patient's feet show the healed surgical scars between the second and the third toes but no other abnormalities are appreciated at this time.

In addition, on November 17, 1992, MetLife received a report from Dr. Leslie Stern, another of plaintiff's treating physicians. Dr. Stern's report stated the following about plaintiff's condition:

This patient has continued to complain of interscapular, as well as neck pain, radiating over both shoulders and intermittently to the left arm to the elbow level. The pain has been fairly continuous, worse with activity, particularly sitting. She does not describe paresthesia, weakness, or change in sphincter function. She has tried two or three anti-inflammatory agents, as well as muscle relaxants, with no success. She has difficulty sleeping at night because of the discomfort.

On examination there was marked restriction of neck motion in all directions, particularly extension, and left lateral rotation. There was no tenderness to palpation over the cervical spinous processes. There were no masses or nodes felt in the neck. Power was normal in the extremities. Deep tendon reflexes were 2/4 with bilateral plantar flexor responses. Sensory examination was essentially unremarkable.

Review of the cervical MR scan reveals a disc herniation at C6–7 biased to the left, of mild-to-moderate degree.

This patient has symptoms related to the above-described findings, and will be treat-

ed with a soft collar, cervical traction, and an anti-inflammatory agent. She will be seen in follow-up at intervals.

On December 12, 1992, MetLife wrote to plaintiff stating that based upon a review of the information they had received to that point, they were going to require more medical information to evaluate her claim. Accordingly, MetLife informed her that it was in the process of setting up an independent medical examination. Two days later, MetLife requested that plaintiff appear before Dr. Lee Goldstein, a psychiatrist, on December 31, 1992 for an independent evaluation. Plaintiff appeared before Dr. Goldstein on December 31, and Dr. Goldstein submitted a report of that examination to MetLife on January 3, 1993. The substance of his conclusion is as follows:

> This woman has no significant psychiatric condition which would deter her from working. Her pain does not seem feigned.... I believe that she will be able to go back p+3 to work when her physical pain is relieved enough to allow her to concentrate on something other than her neck, shoulders and back.

On January 19, 1993, MetLife approved plaintiff's application for benefits up through February 2, 1993. In a separate letter of that same date, MetLife also requested that she appear before Dr. Lloyd Barnard, an orthopedist, for an independent medical examination on February 2, 1993.

Following that exam, on February 6, 1993, Dr. Barnard completed a Certified Consultant's Evaluation Form stating that based on his examination of the plaintiff and review of her medical records, that with respect to the physical requirements of her job, she had some limitation in "climbing (stairs/ladders/scaffolds)", "reaching (forward/overhead)", "pushing/pulling/twisting (arm/leg controls)", and "bending/stooping/squatting", and no limitation in sitting, "concentrated visual attention", "grasping/handling", "finger dexterity" or "repetitive movement (hand/feet)". Additionally, on February 17, 1993 Dr. Barnard issued a narrative report which provided, in part:

> I think this lady has a cervical strain and a herniated cervical disc, the cervical strain

is, in my judgment, due to the 10/21/92 (sic) accident, the herniated disc may or may not be due to this accident, in my judgment. In coming to the judgments that I have rendered, I have read the reports that you have sent me from Dr. Kozel and Dr. Drennan at the Newport Hospital Physiatry Department. I think this lady is capable of light duty work at present....

On February 23, 1996, plaintiff was operated on by Dr. Stern. MetLife learned of the surgery the next day during a telephone conversation with Dr. Stern.

On June 1, 1993, Dr. Stern provided an Attending Physician's Statement of Functional Capacity. The statement diagnosed plaintiff as having "post cervical discectomy" and "neck pain". It further stated that plaintiff had no limitation as to ability to stand, sit, change position, finger dexterity or concentrated visual attention, and some limitation as to capacity for general transportation, grasping/handling and repetitive movement (hands/feet). The statement also indicated that she should completely avoid reaching (forward/overhead), pushing, pulling, twisting (arm/leg controls), climbing (stairs/ladder/scaffold) and bending, stooping or squatting. On June 24, 1993, MetLife wrote Dr. Stern asking him to provide a narrative report outlining plaintiffs condition, restrictions and limitations, current and future treatment and objective testing. On that same day, MetLife wrote plaintiff requesting that she make sure Dr. Stern provided the narrative statement. More than a month later, MetLife wrote the plaintiff indicating that they had not yet received the requested narrative from Dr. Stern.

On August 3, 1993, Dr. Stern responded with the following narrative:

> This patient continues to complain of postoperative neck and left shoulder pain on an intermittent basis. However, I would consider her likely capable of light work as of September 1, 1993. Her job description as submitted is acceptable except for three modifications which are required because of her condition. She would have restrictions from reaching forward or over her

head, from pushing or pulling, and from bending, stooping, squatting, which are apparently listed on her job description as occurring up to twenty percent of her working day.

Based upon that report, on August 30 MetLife wrote the plaintiff the following letter terminating her benefits:

Recently we received an August 3, 1993 letter from your attending physician, Dr. Stern, who indicated that you are capable of returning to work on a light duty basis effective September 1, 1993. Based upon our review of this information, as well as a summary of your job duties at the Raytheon Company, your claim has been suspended effective September 1, 1993.

If you remain disabled and wish to claim benefits beyond this date, please have your physician provide our office with a detailed narrative report on your current medical condition. This report should include your present limitations and restrictions, any recent objective testing of your condition, your present and future course of treatment, as well as your most recent date of treatment. Finally, your physician should include his opinion how your present condition prevents you from returning to work at the Raytheon Company, including any facts or reasons to support his opinion.

In all, Plan benefits had been paid to plaintiff from November 19, 1992 through August 31, 1993.

In early October 1993, MetLife received the following report from Dr. Stern regarding plaintiff's condition and ability to work:

This patient continues to complain of neck and bilateral shoulder pain post cervical discectomy. She was stated to be capable of light work with restrictions. Because these restrictions are apparently unacceptable to her employer she is now considered totally disabled, the duration of this is indefinite.

However, a MetLife office memo of an October 15, 1993 conversation between the claims representative, Steve Craven, and the group claim consultant, Michael Drummond, indicates the following:

Mike called to discuss claim. Advised firm [received] letter from [Attending Physician] indicating Raytheon could not accommodate restrictions. This is not accurate as Raytheon is able to make any accommodations. I did want to verify if job was indeed sedentary. He said it is sedentary. Told him ok, I am still trying to contact the [Attending Physician] to advise him of this.

(This information was again confirmed by MetLife in a conversation between Mr. Craven and Raytheon's Sandra Del Ross on October 25, 1993.)

On October 18, 1993, MetLife again wrote the plaintiff, informing her that her benefits were terminated effective September 1, 1993:

Under the group policy for Raytheon Company, for the first 24 months after Long Term Disability benefits begin, the medical evidence must prove the insured is unable to perform substantially all of the duties of her occupation at Raytheon Company.

According to an August 3, 1993 letter from your attending physician, Dr. Stern, he indicated that you would be capable of returning to work on a light duty basis effective September 1, 1993. Based upon our review of this information, your claim was suspended effective September 1, 1993, as stated in our August 30, 1993 letter to you. Our August 30, 1993 letter also stated that if you wished to claim benefits beyond August 31, 1993, you were to have your physician provide additional medical documentation proving your continued disability. Recently we did receive a September 29, 1993 note from Dr. Stern who indicated that you continued to complain of neck and bilateral shoulder pain. However, Dr. Stern did not provide any objective medical evidence to support your continued inability to perform the regular duties of your job as a Program Control Administrator. Therefore, you do not meet the definition of disability as defined above, and we have no alternative but to terminate your claim effective September 1, 1993.

On November 10, 1993, plaintiff again requested a review of her claim. Along with this request, plaintiff forwarded a November

2, 1993 narrative from Dr. Stern which stated in part:

I would consider this patient totally disabled at the present time, because of her inability to sit or stand for prolonged periods of time, such as required at her work. The duration of this disability would be indefinite.

On November 19, MetLife wrote plaintiff informing her that the decision to terminate Plan benefits was being upheld. MetLife stated that a review of the medical information, including the November 2, 1993 Dr. Stern letter, "did not provide . . . an objective basis to substantiate a totally disabling condition beyond September 1, 1993."

On December 7, 1993, plaintiff met with Raytheon's Medical Director, Dr. John T. McCaffrey and reported that she would like to try to return to work. On January 25, 1994, Dr. McCaffrey wrote Dr. Stern:

Barbara Coleman's case has been reviewed. I met with her on 12/7/93 at which time she stated she would like to try to return to work. I asked her to get a note of approval from you. Your last note of 9/28/93 disabled her because of accommodations not being met. She has failed to provide me with a note.

Please review the enclosed job description of a Program Control Administrator and inform me as to whether she could return to work if she would be restricted from reaching forward, over her head, pushing, pulling, bending and stooping, or squatting. In accordance with the American Disability Act, the company would have to afford the accommodations you set forth to allow this employee to return to work. At this end, we will make every attempt to do so.

On March 28, 1994, plaintiff's counsel, Robert Karns, wrote to MetLife requesting another review of the claim. MetLife responded on April 5 stating:

This is to acknowledge the receipt of your recent correspondence concerning Barbara Coleman.

We are interested in providing Ms. Coleman with a thorough and fair review. Therefore, we ask that the enclosed Attending Physician's Statement of Functional Capacity form be completed in its entirety based on the most recent examination of Ms. Coleman. We ask that this form be submitted within the next thirty days.

The "Physician's Statement" was completed by Dr. Stern on April 11. The statement indicated that plaintiff was suffering from "chronic neck and bilateral shoulder pain". With respect to any limitations pertaining to the key physical requirements of plaintiff's job, Dr. Stern ascribed no limitation as to her capability for "finger dexterity" or "concentrated visual attention", some limitation as to general "transportation", standing, sitting, "change of position (sitting/standing)", and "grasping/handling", and stated that she should "avoid completely" "reaching (forward/overhead)", "pushing/pulling/twisting (arm/leg controls)", "repetitive movement", "climbing (stairs/ladders/scaffolds)", "bending/stooping/squatting".

In early May 1994, MetLife requested a review of plaintiffs file by Dr. Dennis Allen, a medical consultant. Dr. Allen reviewed the plaintiff's medical records, and on May 5, 1994 reported the following to MetLife:

*Diagnosis/Prognosis:* Chronic pain—improved per AP [Attending Physician] (6/93)—surgery 2/93.

*Clinical Summary:* Claims several functional impairments some of which would be incompatible with usual job if there were objective clinical data to support the assessment as reported by AP 6/93. In my opinion there is no objective evidence of a condition which would render her disabled from her usual job.

*Recommendation:* Terminate claim (from 9/1/93).

On May 9, 1994, MetLife again wrote plaintiff informing her that the decision to terminate her benefits was being upheld. MetLife reiterated its previous assertion that "[t]here is no objective evidence to substantiate a disabling condition beyond September 1, 1993." Another request by plaintiff's counsel to reconsider plaintiff's claim was received by MetLife in late August 1994. Accompanying the request were previously

submitted reports and evaluations from Dr. Stern, as well as, a notice of an award by the Social Security Administration of disability benefits to plaintiff.

In September of 1994, MetLife retained Dr. Robert Bertrand, an independent medical reviewer, to review plaintiffs claim. Dr. Bertrand reviewed the records and on September 27 submitted a report which read in relevant part:

*OPINION:* It is my opinion as a Board Certified Occupational Physician, that Ms. Coleman is not totally disabled for (sic) her own occupation. This d tes back to September 1, 1993.

*DISCUSSION:* In a letter dated August 3, 1993, Dr. Leslie Stearn (sic), the patient's attending Neurosurgeon, felt that she could return to work to light duty as of October 1, 1993 (sic). At that time, and after having reviewed her job description, he suggested the following restrictions— that she should not reach forward or over her head, that she should not have any pushing or pulling, and that she should avoid bending, stooping, squatting. Otherwise, he felt that she could do the duties of her job which essentially is a sedentary job. The job title is program control administrator and I reviewed that job description as well. Dr. Stearn's letter dated November 2, 1993, addressed to Attorney Robert T. Carns, gives an excellent summary of the patient's situation. I feel that she has developed chronic pain syndrome and return to work should be encouraged, for her own well-being. I also feel that the records available for review, indicate that she should be able to return to light duty. She may require the interventions of a chronic pain approach to help her get back to work. I do feel though, at this time, that the records available indicate that Ms. Coleman is capable of light duty work and specifically, of her own occupation, with the restrictions suggested by Dr. Stearn.

Based in part on Dr. Bertrand's report, MetLife wrote plaintiff on September 30, 1994 again affirming its decision to terminate the payment of Plan benefits as of September 1, 1993. In late December 1994, plaintiffs counsel, Karen Davidson, wrote MetLife

again requesting that plaintiff's benefits be reinstated, that MetLife provide certain documents, and that MetLife explain its reason for terminating plaintiff's benefits. MetLife responded to that request on January 3, 1995 as follows:

This is in reply to your December 28, 1994 letter concerning Barbara Coleman.

Long Term Disability benefits for Ms. Coleman were terminated effective September 1, 1993, when it was determined that, based on all the medical and vocational information on file, she was no longer totally disabled from performing her occupation at Raytheon Company.

Please contact Betty Merlino at the following address for copies of the Group Policies you refer to in your letter:

> Raytheon Company
> 141 Spring Street
> Lexington, MA 02173

Plaintiff's counsel wrote MetLife again on April 12 stating, "[p]lease be advised that I continue to represent Barbara Coleman and we are still waiting to be paid monies under the disability claims that she has ..." The very next day, plaintiff's counsel again wrote MetLife forwarding a report from a Dr. David Johnson. Dr. Johnson's report states in part:

It is with a high degree of medical certainty, after reviewing Ms. Coleman's records, I conclude that it would be impossible for her to return to her occupation at Raytheon and ... feel that she is 100% disabled as according to the Social Security Act.

On April 18, 1995, plaintiff commenced an action for breach of contract and bad faith in Providence County Superior Court. The action was removed to this court by the defendants on May 9, 1995. Thereafter, defendants moved to dismiss the claim asserting ERISA preemption. Upon stipulation of the parties, plaintiff amended the complaint to assert the current claim under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

## II. ANALYSIS

### A. *Standard of Review*

As a preliminary matter, the appropriate standard of judicial review to be applied under ERISA with respect to the denial of a claim by an insurer must be determined. This issue was addressed by the Supreme Court in *Firestone Tire and Rubber Co. v. Bruch, et al.,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Firestone,* the Court noted that although the ERISA statute does not prescribe a standard of judicial review, most federal courts had adopted the arbitrary and capricious standard developed under 29 U.S.C. § 186(c) of the Labor Management Relations Act (LMRA). *Id.* at 109, 109 S.Ct. at 953–54. The Court noted, however, that this standard had been adopted not so much as a standard of review under the LMRA but, more importantly, as a means of asserting jurisdiction under § 186(c). *Id.* Accordingly, the Court, reasoning that ERISA provided its own jurisdictional basis, decided that the standard of review in ERISA actions should instead be consistent with the principles of trust law. *Id.* at 111, 109 S.Ct. at 954–55. Therefore, the Court held that a de novo standard of review must apply to denials of benefits challenged under § 1132(a)(1)(B) "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956–57.

Subsequently, the circuits have held that in order for the more deferential arbitrary and capricious standard to apply such "discretionary authority" as defined by *Firestone* must be expressly conferred by the plan in question. *See, e.g., Moon v. American Home Assurance Co.,* 888 F.2d 86, 88–89 (11th Cir.1989); *Batchelor v. Int'l Broth. of Elec. Workers Local 861 Pension and Retirement Fund,* 877 F.2d 441, 443 (5th Cir.1989); *Boyd v. Trustees of United Mine Workers Health and Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989); *Bali v. Blue Cross and Blue Shield Association,* 873 F.2d 1043, 1047 (7th Cir.1989). A finding of this express authority does not hinge on a policy's use of any magic words such as "discretion". *See Block v. Pitney Bowes,* 952 F.2d 1450, 1453

(D.C.Cir.1992). The policy must, however, set forth terms sufficient such that it can reasonably be found that such power and discretion has been conferred. For example, in *Block,* the plan in question contained language conferring upon the administrator the power "to interpret and construe the Plan, [and] to determine all questions of eligibility and the status and rights of Participants", as well as language that all decisions of the administrator "shall, to the extent not inconsistent with the provisions of the Plan, be final and conclusive and binding upon all persons having an interest in the Plan." *Id.* at 1452–53. The D.C. Court of Appeals held that this language conferred authority upon the administrator that was precisely what the *Firestone* Court delineated as discretionary. *Id.* at 1454. *See also Jett v. Blue Cross and Blue Shield,* 890 F.2d 1137, 1139 (11th Cir. 1989) (Eleventh Circuit held that plan which gave administrator "final and conclusive" authority to make determinations granted discretionary authority); *Boyd,* 873 F.2d at 59 (plan which gave Trustees the power of "full and *final* determination as to all issues concerning eligibility for benefits" found to confer discretionary authority (emphasis added)).

In the present instance, the parties agree that the Plan in question confers discretionary authority such that, in accord with *Firestone,* the more deferential standard of review applies. *Firestone* also states, however, that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." 489 U.S. at 115, 109 S.Ct. at 956. Plaintiff argues that MetLife was operating under such a conflict of interest which must be weighed by this court in its review of MetLife's termination of plaintiff's benefits. Plaintiff cites to *Bass v. Prudential Ins. Co. of America,* 764 F.Supp. 1436, 1440 (D.Kan.1991), for its proposition that "a strong conflict of interest exists when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims." Plaintiff's reliance on the reasoning in *Bass,* however, is misplaced. *Bass* dealt with an

insurance company that payed "beneficiaries from its own assets rather than the assets of a trust." *Id.* at 1439. It is axiomatic that the fiduciary role of a plan administrator which pays its *own* money to claimants is in conflict with its role as profit maker. Such a conflict did not exist, however, in this instance.

The Plan was funded by Raytheon employees who made monthly contributions to the Raytheon Employees' Disability Trust (the "Trust"). The Plan was administered by MetLife under a modified Limited Liability arrangement with Raytheon. Under this arrangement, all benefits were paid by the Trust, but a claim was "insured" by MetLife until the end of the calendar year in which the claimant claimed a disability. That is, MetLife would only have to pay its own money if the Trust was unable to pay benefits as of a particular date, and even then MetLife would only be required to pay on claims filed within that calendar year. At the end of that year in which the claim was filed, any benefits paid under the Plan were required to be funded by the Trust. Accordingly, any conflict of interest on behalf of MetLife would be limited to the first calendar year of plaintiff's claim, in this case 1992. Plaintiff, in fact, received Plan benefits during this time. It was not until the second calendar year, September 1, 1993, when all benefits were required to be paid from the Trust, that benefits were terminated.

■ Plaintiff also alleges that because MetLife is hired and paid by Raytheon to administer the Trust and the Plan, MetLife has an incentive to deny claims in order that it will continue to be hired by Raytheon. This can hardly be a circumstance that the *Firestone* court had in mind when it spoke of an "administrator or fiduciary ... operating under a conflict." 489 U.S. at 115, 109 S.Ct. at 957. If such were the case, it is difficult to imagine an instance where a plan administrator would not be operating under such a conflict. Obviously the *Firestone* court had in mind a situation such as that in *Bass* where the administrator of the plan had a direct interest such as the sole source of benefit funds, rather than a selfish business interest. It was in Raytheon's interest to see

that its employees were fairly treated. Therefore, a miserly approach to benefits could just as well have provoked a search for a new and more friendly Plan administrator. Accordingly, because the Plan confers discretionary authority upon MetLife, and because no conflict of interest exists, MetLife's termination of Plaintiff's benefits will be reviewed under an arbitrary and capricious standard.

### B. *Denial of Claim*

■ The arbitrary and capricious standard is the "least demanding form of judicial review" and requires only that determinations be "rational in light of the plan's provision," as well as, reasonable with no abuse of discretion. *Perry v. United Food and Commercial Workers District Unions 405 and 442,* 64 F.3d 238, 242 (6th Cir.1995); *see also Firestone,* 489 U.S. at 111, 109 S.Ct. at 954–55. In other words, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry,* 64 F.3d at 242 (quoting *Davis v. Kentucky Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir. 1989)). Plaintiff argues that MetLife's actions were, in light of the facts of this case, unreasonable, irrational and an abuse of discretion such that they were arbitrary and capricious.

Plaintiff's main contention is that MetLife was arbitrary and capricious in that it essentially ignored the reports and narratives of plaintiff's treating physician, Dr. Leslie Stern. A review of the record reveals that this is simply not the case.

MetLife paid plaintiff's benefits up until September 1993, at which time Dr. Stern wrote, "I would consider her likely capable of light work as of September 1, 1993." At that point, MetLife justifiably terminated Plan benefits as plaintiff's own physician indicated that she was not "totally disabled" according to the terms of the Plan. Following the termination of benefits, Dr. Stern backpedaled with his October 1993 report stating that he now considered plaintiff "totally disabled" because restrictions he had imposed were "apparently unacceptable to her employer." The record does not indicate how, when or by whom Dr. Stern was informed that such restrictions were unacceptable to

Raytheon. The record does indicate, however, that based upon Dr. Sterns assertion, MetLife confirmed on at least two occasions that Raytheon was ready and willing to make any accommodations that were imposed by Dr. Stern.

Dr. Stern, however, backpedaled once again in his November 1993 report/narrative. Dr. Stern, at that time, indicated that the plaintiff was "totally disabled" because she could not sit or stand for extended periods. The implication of this letter was that no matter what accommodations Raytheon was willing to make, the plaintiff could not return to work. This narrative was contrary not only to Dr. Stern's August 1993 and October 1993 reports but also to his June 1, 1993 Attending Physicians Statement of Functional Capacity in which he indicated that the plaintiff had no limitations as to sitting or standing. MetLife upheld the termination of the benefits at that time because Dr. Stern failed to provide any objective basis to support his new assertion that plaintiff was now totally disabled.

Again in late March 1994, plaintiff requested that MetLife review its termination of her benefits. MetLife complied and provided an Attending Physician's Statement for Dr. Stern to complete. The form was completed by Dr. Stern on April 11, 1994. Once again, however, Dr. Stern provided only a completely subjective basis for his finding that plaintiff was totally disabled. In fact, the section labeled "Objective findings (including test results)" was left blank. Thereafter, MetLife requested that Dr. Allen, a medical consultant, review plaintiff's claim. Dr. Allan opined that plaintiff's benefits were correctly terminated as of September 1, 1993.

In August of 1994 plaintiff once again requested a review of the termination of Plan benefits. Plaintiff failed, however, to provide any additional objective evidence to support her claim of total disability. Nevertheless, MetLife responded by retaining Dr. Bertrand, an independent medical reviewer. Dr. Bertrand reviewed plaintiff's records, and he also found that MetLife was justified in terminating plaintiff's benefits as of September 1, 1993.

The record is clear that MetLife did not ignore Dr. Sterns reports. In fact, it is exceedingly apparent that it at first made every effort to accommodate the limitations imposed by Dr. Stern, and later, when Dr. Stern's prognosis and opinion abruptly changed, to verify the assertions that plaintiff was totally disabled.

■ Furthermore, the opinions of Dr. Allen and Dr. Bertrand cannot be ignored. The fact that plaintiff's physicians disagreed with these other physicians does not by itself establish arbitrary and capricious action on the part of MetLife. *See Jestings v. New England Telephone and Telegraph Co.,* 757 F.2d 8, 9 (1st Cir.1985). When a plan vests discretion in an administrator such that the arbitrary and capricious standard applies, it is up to the administrator, not judges, to choose between *reasonable* alternatives. *See id.* It cannot be said that MetLife was unreasonable in relying on Dr. Allen's and Dr. Bertrand's opinions over those of Dr. Stern, especially given the frequency with which Dr. Stern's diagnosis differed from his earlier expressed opinions.

Additionally, plaintiff continuously requested reviews of her claim, and MetLife continuously stated that it needed objective evidence to support her claim. Plaintiff, however, failed to provide such evidence. In fact, the last medical report/narrative pertaining to this action, a letter forwarded by plaintiff from Dr. Johnson along with her April 1995 request for reinstatement of Plan benefits, contained only subjective opinions and narrative.

■ Because MetLife's determination did not lack a rational basis, it cannot be disregarded. Accordingly, MetLife's actions were not arbitrary and capricious.

## III. CONCLUSION

For the foregoing reasons, MetLife did not wrongfully deny benefits to the plaintiff. Judgment will enter for defendants for costs.

So Ordered.