June 27, 2024

**Supreme Court**

No. 2023-113-Appeal.
(PC 19-11054)

Rhode Island Troopers : Association et al.

v. :

State of Rhode Island, Division : of the State Police, et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Rhode Island Troopers        :
    Association et al.

            v.               :

State of Rhode Island, Division     :
    of the State Police, et al.

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** This case concerns the denial of a former state trooper's application for a disability pension. The trooper, James Donnelly-Taylor, is the plaintiff.[1] The defendants are the State of Rhode Island, Division of the State Police, and, in their official capacities, Darnell S. Weaver, Colonel of the State Police, and Governor Daniel J. McKee.[2] The state appeals from a Superior Court judgment in favor of the plaintiff that reversed the denial of the

---

[1] The Rhode Island Troopers Association is the first named plaintiff in the complaint. Although the parties filed jointly, it appears that Trooper Donnelly-Taylor is the only plaintiff seeking relief under count three of the complaint, which is the subject of this appeal. Therefore, the Rhode Island Troopers Association is not a party to this appeal.

[2] The defendants named in their official capacities were substituted for their predecessors in office, Colonel James M. Manni and Governor Gina M. Raimondo, respectively.

trooper's request for a disability pension.[3]   After reviewing the record and considering the parties' written and oral arguments, we reverse the judgment of the Superior Court.

# I

## Facts and Travel

Trooper Donnelly-Taylor (the trooper) was a four-year veteran of the state police when, on February 26, 2014, he entered a jail cell and struck Lionel Monsanto, whom he had arrested for driving with an expired license, multiple times. *See State v. Rhode Island Troopers Association*, 187 A.3d 1090, 1093-94 (R.I. 2018).  A few weeks after this incident, the trooper reported that he was experiencing personal and work-related stress, and, in a letter dated April 3, 2014, his doctor, Brian J. Pickett, M.D., recommended that he take a leave of absence.  The Division of the State Police soon thereafter placed him on injured-on-duty status.  That same month, the trooper was called to testify before a grand jury regarding the jail-cell incident, which had been captured on video; and, on May 6, 2014, he was indicted on one count of simple assault.  Trooper Donnelly-Taylor entered a plea of nolo contendere to the assault charge on June 23, 2014.  After accepting his plea, a judge of the Sixth Division District Court ordered the case to be filed in accordance with G.L. 1956 § 12-10-12 and further ordered the trooper to perform twenty-five hours of community service;

---

[3] Unless otherwise noted, we refer to defendants collectively as "the state."

the criminal disposition was thereafter expunged. *Rhode Island Troopers Association*, 187 A.3d at 1094.

In the meantime, the trooper had remained out of work. On July 1, 2014, the division received a note from Dr. Pickett indicating that the trooper could return to the job without restrictions the following month. At an August 5 meeting with the superintendent, however, the trooper admitted to violating division rules during the jail-cell incident and agreed to a thirty-day suspension and counseling. According to an independent psychiatric examination conducted on September 3, 2014, Marilyn Price, M.D., who also attended the August 5 meeting, determined that the trooper was "unable to safely, efficiently and reliably perform all the duties of his position without restriction due to psychological symptoms" but could "work safely and reliably in a position that [did] not require the use of a firearm." Doctor Price attributed multiple stressors to the trooper's symptoms, including matters related to his family life, the jail-cell incident and "the resulting charges" from that incident, and a January 2014 incident in which he had fired his service weapon at a fast-approaching car (its driver was the subject of an investigation) because "he feared for his life and that of a new recruit." In a report summarizing the examination, Dr. Price suggested that the trooper's "personal stressors" and the January incident, which occurred only weeks before the jail-cell incident, "likely * * * contributed to his behavior during the" latter episode. Doctor Price noted,

however, that the trooper "maintained * * * that his behavior during the [jail-cell incident] was not due to either his personal or work-related stressors," that "he was not told until April 2014 that this incident had become an issue," and that "when he left work in April 2014 it was because he was stressed by [family-related] issues" and felt that he "could not cope with the demands of his job." The report concluded with a recommendation that the trooper be "reevaluated for a return to full duty" after at least three months of weekly individual therapy.

In October 2014, Trooper Donnelly-Taylor returned to duty in a limited capacity for a three-month transitional period, during which period he attended recurring treatment sessions with Marjorie Lamphear, Ph.D., LMHC, and separately with Craig Kaufmann, M.D. After three months of treatment, Dr. Lamphear wrote a letter to the division, dated December 17, 2014, in which she expressed "no qualms about having him return to full-duty status." Doctor Kaufmann expressed a similar opinion in a different letter, dated January 9, 2015, in which he wrote that "there [we]re no psychiatric conditions precluding [the trooper] from a return to full duty * * *." The division authorized the trooper's return to full-duty status without restrictions on January 30, 2015.

The record indicates that, over the following year, the trooper experienced no psychiatric issues that required care. Then, in March 2016, the victim of the jail-cell incident, Lionel Monsanto, filed a federal lawsuit naming Trooper Donnelly-Taylor,

in both his official and his individual capacities, as one of several defendants. *Rhode Island Troopers Association*, 187 A.3d at 1094. When the trooper sought legal representation from the state with respect to these claims, however, the Department of the Attorney General responded that it would provide for his legal defense, but only with respect to the claims against him in his official capacity.

As for the claims against the trooper in his individual capacity, the department stated not only that he would have to seek representation, if any, from a private attorney, but also that it would not reimburse him for the costs of his personal legal defense. The department cited G.L. 1956 § 9-31-9, which authorizes the attorney general to refuse a request from a state employee for legal representation as a defendant in a civil action when, among other grounds, "[t]he act or omission" alleged in the civil action "was not within the scope of employment," or "[t]he act or the failure to act was because of actual fraud, willful misconduct, or actual malice[.]" Because the trooper had pled nolo contendere to one count of assault for the same conduct alleged in Monsanto's civil action, the department explained that, at least with respect to the claims naming the trooper in his individual capacity, the state was not obligated to represent him. The resulting dispute between the trooper's union and the state is the subject of *Rhode Island Troopers Association*, in which we held that the information available to the attorney general regarding the jail-cell incident, including the trooper's plea and a video recording of the incident, supported

the attorney general's determination that the trooper's actions "fell outside the scope of his employment * * * and that a jury could conclude that he acted willfully." *Rhode Island Troopers Association*, 187 A.3d at 1103-04.

Almost a year after the federal lawsuit was filed, on February 15, 2017, Trooper Donnelly-Taylor sent a division-wide email in which he asked recipients to watch a hyperlinked video interview of Monsanto that, according to the trooper, revealed what he "had to deal with" on the night of the jail-cell incident. He also lamented that his name had been "dragged through the mud" with respect to the pending lawsuit and that he was "left to defend [him]self."

The next day, on February 16, 2017, the division opened an investigation into the trooper's "unauthorized use" of its email system and to determine whether his physical or mental state rendered him unfit for duty. The trooper attended a meeting with division command staff, his supervisors, and union leadership that same day, during which he indicated that the pending lawsuit and his perceived lack of support from the division had adversely affected his mental state. He also agreed that he was not fit for duty, that he should remain on leave until his symptoms improved, and that he would visit Dr. Pickett for an evaluation. In a letter summarizing that visit, Dr. Pickett noted that the trooper had returned to full duty after "a period of significant stress" following the jail-cell incident. He observed that "Trooper Donnelly-Taylor's stress and anxiety [had] once again escalated," however, "given

the pending civil litigation" stemming from that incident and "recent media attention regarding the case[.]" Doctor Pickett therefore recommended that the trooper take another leave of absence, but the doctor expressed hope that, once his "current legal issues" resolved, the trooper would "ultimately be able to carry on his career with the Rhode Island State Police."

The trooper thereafter returned to injured-on-duty status. As a condition of that status, he resumed regular treatment with Dr. Kaufmann, a licensed psychiatrist who, in addition to keeping notes on the trooper's progress, provided the division with periodic updates. In a letter dated April 24, 2017, Dr. Kaufmann reported that the trooper was "exhibiting symptoms of post-traumatic stress disorder" that "interfere[d] with his ability to function in a work setting." These symptoms not only persisted, but also appear to have worsened, with Dr. Kaufmann writing on February 13, 2018, that the trooper had experienced "a recent exacerbation of his condition" that required additional forms of treatment. Then, on November 6, 2018, Dr. Kaufmann informed the division that, in his judgment, "[g]iven the chronicity of [the trooper's] symptoms, I consider him to be medically disabled from his prior work capacity."

In December 2018, Trooper Donnelly-Taylor made a formal request to the superintendent for a disability pension. The statute governing such requests is G.L. 1956 § 42-28-21(a), which entitles to an annual pension "any member of the

division" who has "in the course of performance of his or her duties suffered injury causing disability" and whose "service is terminated" as a result. In a subsequent letter to the division, dated March 27, 2019, he argued that he met these criteria. In addition to providing excerpts from Dr. Kaufmann's earlier progress notes, quoted above, the trooper attached a more recent letter, dated March 25, 2019, which contained three notable findings. First, Dr. Kaufmann wrote that the trooper had been diagnosed with "major depressive disorder and post-traumatic stress disorder (PTSD)." Second, he expressed that, in his opinion, the trooper "developed PTSD and trauma-related symptoms as a direct consequence to experiences while employed as a Rhode Island State Trooper." And third, the doctor concluded that the trooper was "not able to perform his previous duties with the Rhode Island State Police." According to Trooper Donnelly-Taylor, Dr. Kaufmann's medical opinion "confirm[ed] that [his] PTSD is work-related, *i.e.*, that it was sustained in the performance of duty," thus entitling him to a disability pension in accordance with § 42-28-21(a).

Colonel James M. Manni, then the Superintendent of the Rhode Island State Police, thereupon scheduled a hearing on the trooper's disability-pension request, which took place on August 8, 2019. According to the superintendent, the hearing would be "non-adversarial in conduct and informal in tone," but the trooper was

- 8 -

advised that it would be his burden to show that he was entitled to the pension. He was also invited to submit a post-hearing memorandum in support of his request.

On October 17, 2019, the superintendent issued a written decision denying the trooper's request for a disability pension. After summarizing the relevant facts and evidence, including about four pages of excerpts from Dr. Kaufmann's notes, the superintendent characterized the central issue as whether, "in the course of performance of his * * * duties," the trooper "suffered injury causing disability." (Citing § 42-28-21(a).) The superintendent next explained that, according to previous decisions of this Court, it was the trooper's burden to prove that he was entitled to a disability pension. (Citing *Canario v. Culhane*, 752 A.2d 476, 479 (R.I. 2000); *Frost v. City of Newport*, 706 A.2d 1354, 1355 (R.I. 1998).) Regarding the standard of review, the superintendent asserted that those same decisions afforded the superintendent "great discretion in determining an officer's eligibility for a disability pension" and limited the scope of review to assessing whether the superintendent's determination was "arbitrary [and] capricious." (Quoting *Canario*, 752 A.2d at 479.)

Turning to his analysis, the superintendent found that, although the trooper had in fact "suffered injury causing disability," he had not proven "that his disabling injury was suffered 'in the course of performance of his * * * duties.'" In support of his first finding, the superintendent cited three statements from Dr. Kaufmann, all

of which appear above: (1) that the trooper had been diagnosed with "major depressive disorder and post-traumatic stress disorder (PTSD)"; (2) that he was "not able to perform his previous duties with the Rhode Island State Police"; and (3) that, "[g]iven the chronicity of his symptoms," he was "medically disabled from his prior work capacity."

As for the superintendent's second finding of fact, he "recognize[d] and accept[ed] Dr. Kaufmann's 'opinion that Trooper Donnelly-Taylor developed PTSD and trauma-related symptoms as a direct consequence to experiences while employed as a Rhode Island State Trooper.'" The superintendent noted, however, that injuries suffered "as a direct consequence to experiences while employed as" a state trooper are not necessarily suffered "in the course of performance of * * * duties." In support of this premise, the superintendent cited his own "informed judgment," acquired over decades of experience, including twenty-five years with the state police. He also cited *Canario*, in which this Court affirmed the denial of a disability pension to the plaintiff, a state trooper, who was injured while riding his personal motorcycle home from an assignment at his local barracks. *Canario*, 752 A.2d at 477-78. There, we expressed our agreement with the superintendent that "the plaintiff was not injured while performing his duty as a state police officer." *Id.* at 480. More relevant to the standard of review, however, and thus our ultimate holding, was our statement that "[i]t [could] scarcely be contended that it was

irrational to determine that at the moment of the automobile collision, from which [the plaintiff's] injuries arose, he was not engaged in a duty status." *Id.* (The superintendent's decision in the present case quoted both statements.)

From this juncture, the superintendent set about determining the moment from which the trooper's injuries arose and whether he was engaged in a duty status at that time. On the first question, the superintendent determined that "the impetus for Trooper Donnelly-Taylor's disability-pension request" was the 2014 jail-cell incident: specifically, the trooper's assault of Monsanto. On the second question, the superintendent found that, when the trooper assaulted Monsanto, he was not engaged in a duty status.

The superintendent emphasized that, in his opinion, and based on the available evidence, the trooper's "disabling stress resulted not from his arrest of Mr. Monsanto but from his assault of Mr. Monsanto and its consequent fallout." He also distinguished that stress, as a causal matter, from the stress that led to the trooper's initial assignment to injured-on-duty status in April 2014. Regarding the "fallout" of the assault, the superintendent observed that Dr. Kaufmann's progress notes were replete with references to several experiences that affected the trooper's mental state, including the Monsanto lawsuit, the attorney general's decision not to defend the individual-capacity claims against the trooper in that lawsuit, the trooper's subsequent legal battle with the state, and "related public scrutiny and news

- 11 -

coverage." "Notably," the superintendent added, Dr. Kaufmann's progress notes contained "no reference to the arrest itself as being stress-inducing."

Regarding the trooper's April 2014 assignment to injured-on-duty status, the superintendent found that the stress that precipitated that assignment "appear[ed] to have been unrelated to the [jail-cell] incident." As support, the superintendent drew from Dr. Price's report on her September 2014 psychiatric examination of the trooper, quoted above, during which examination the trooper maintained that his conduct in the jail cell was not due to personal or work-related stress and that, when he left work in April 2014, he did so because of stress related to his home life, and he was not yet aware that the jail-cell incident "had become an issue."

Having determined that the impetus for the trooper's disability-pension request was his assault of Monsanto and its consequent fallout, the superintendent turned to the second question, i.e., whether the assault occurred in the trooper's performance of his duties. "[W]ith respect to that assault," the superintendent expressed that he was "in agreement with the opinion of the Rhode Island Attorney General, as affirmed by the Rhode Island Supreme Court, that it was not within the scope of his duties as a Rhode Island State Trooper." He then quoted at length the decision in *Rhode Island Troopers Association*, including our statement therein that the attorney general had a sufficient basis to determine that the trooper's conduct during the jail-cell incident "fell outside the scope of his employment" as a state

police officer. *Rhode Island Troopers Association*, 187 A.3d at 1104.  Referring to the stressors described in Dr. Kaufmann's progress notes and discussed above, including the trooper's multiple legal issues and related public scrutiny, the superintendent remarked:

> "To be sure, Trooper Donnelly-Taylor underwent these 'experiences while employed as a Rhode Island State Trooper' since he remains such to this day.  However, because these experiences flowed from his pleading nolo contendere to a charge of assault rather than from [the] arrest of Mr. Monsanto, and because such assault was not within the scope of his duties, these experiences and their concomitant stress cannot justly be characterized as having been suffered in the performance of his duties."

Accordingly, the superintendent found that the trooper's "disabling injury * * * is not duty-related and not properly the basis for a disability pension."

The superintendent's decision also considered four arguments that Trooper Donnelly-Taylor raised in his post-hearing memorandum.  The trooper's first argument was that Dr. Kaufmann's statement—that the trooper's injuries were suffered "as a direct consequence to experiences while employed as" a state police officer—satisfied the elements of § 42-28-21(a) and, because this "medical evidence" was "undisputed," the superintendent was required to grant the disability pension.  In response, the superintendent repeated his assertion that he could accept Dr. Kaufmann's medical opinion while nevertheless finding that the trooper's injuries, although suffered as a direct consequence to experiences while employed

as a state trooper, did not occur in the course of performance of his duties. He further cited caselaw for the proposition that he had discretion to reject even "[p]ositive, uncontradicted evidence * * * if it contain[ed] inherent improbabilities or contradictions" that undermined its value. (Quoting *Hughes v. Saco Casting Co., Inc.*, 443 A.2d 1264, 1266 (R.I. 1982) (involving a commissioner's discretion to deny workers' compensation benefits)).)

Trooper Donnelly-Taylor's second argument also concerned the superintendent's discretion, noting that "a plain reading of § 42-28-21(a) does not even make clear that the disability pension decision is up to the [superintendent]." The superintendent conceded that this was a "fair point," but only if one read the statute "without regard to its history or judicial interpretation," which he then considered at length. "In all events," he said, the trooper had "asked the superintendent to decide—thus the superintendent [would] decide[]." Next, the trooper argued that the standard for granting a disability pension under § 42-28-21(a) "is less demanding than for non-State Troopers," and therefore the superintendent "may not apply case law concerning disability pension benefits afforded to * * * other types of employees." The superintendent responded that such caselaw, even if nonbinding, "could nevertheless inform the superintendent's exercise of his discretion under § 42-28-21(a)." The superintendent further rejected the trooper's related contention that his "conduct * * * [was] not a factor by the plain terms of

- 14 -

applicable law" and it was "irrelevant" whether his actions during the jail-cell incident "were 'right' or 'wrong.'" "[O]f course the conduct of a trooper is relevant," the superintendent explained, because "that is what determines whether the trooper was acting in the performance of duty, which is one of the requirements to obtain a disability pension."

Finally, the trooper argued that the superintendent was estopped from denying his request for a disability pension because the division had already assigned him to injured-on-duty status. The trooper cited G.L. 1956 § 45-19-1(a), which entitles to injured-on-duty benefits "any police officer of * * * the state of Rhode Island [who] is wholly or partially incapacitated by reason of injuries received * * * in the performance of his or her duties * * *." Because this statute contains the same in-the-performance-of-duties language as § 42-28-21(a), the trooper contended that the division could not grant him injured-on-duty status on the one hand but deny his request for a disability pension on the other. In the trooper's words, the division could not "now dispute the medical causation or otherwise deny what it has already conceded."

According to the superintendent, this argument overlooked important distinctions between the two statutes, namely that, in contrast to a determination under § 45-19-1, a § 42-28-21(a) decision has lifelong implications. The superintendent further suggested that, if the former determination controlled the

- 15 -

latter, this would not only contradict previous decisions of this Court regarding the superintendent's discretion under § 42-28-21(a), but also prompt the division to be far more stringent in its application of § 45-19-1, which, he noted, this Court has held "should be liberally construed." (Quoting *McCain v. Town of North Providence*, 41 A.3d 239, 244 (R.I. 2012).) "[A]lthough it seems clear enough that most § 45-19-1 and § 42-28-21(a) decisions will be in accord," the superintendent concluded, "there may be times, as here, when they are justifiably not."

On November 15, 2019, the trooper filed a three-count complaint in Superior Court seeking an administrative appeal of the superintendent's decision. The first two counts were resolved in favor of the state and are not relevant to this appeal. Count three, however, alleged that the superintendent's denial of the trooper's request for a disability pension was arbitrary and capricious. (In a subsequent memorandum, the trooper argued that the superintendent was estopped from denying his disability-pension request.) In November 2021, after hearing cross-motions for summary judgment on these (and other) issues, the Superior Court remanded the trooper's appeal to the superintendent. Specifically, the court found that the superintendent's decision was "not supported by the facts or law and therefore was arbitrary and capricious." On remand, the court directed the superintendent to further address the apparent inconsistencies between granting the trooper injured-on-duty benefits and then later denying his request for a disability pension. The

court also found that the superintendent did not adequately explain his determination as to the cause of the trooper's injuries, nor, for that matter, his rationale for purportedly overriding the "uncontradicted testimony of a medical expert." The court therefore instructed the superintendent to provide:

> "(1) a sufficient rationale supporting his conclusions regarding what activities are within a state trooper's scope of employment; (2) a sufficient rationale supporting his conclusions as to what standard of medical causation applies in such cases; and (3) sufficient findings of fact, either drawn from the medical testimony in evidence or explaining and justifying his disregard for such evidence, to support his determination of medical causation with respect to [the trooper's] disabling injury."

The superintendent thereafter submitted a supplemental decision on remand, which began with an assertion that, contrary to the Superior Court's suggestion, he had not rejected the medical evidence before him. Regarding the division's separate §§ 45-19-1 and 42-28-21(a) decisions, the superintendent stated that the trooper had been assigned to injured-on-duty status "out of expediency" and that, had he not been placed thereon, he nevertheless would have been granted full-paid sick leave. The superintendent then addressed each of the court's three instructions. First, the superintendent noted that, instead of determining "what activities are within a state trooper's scope of employment," he "approached this issue * * * by identifying what activities are *not* within" that scope, "and committing an assault on a citizen is high in that list." Second, regarding the applicable standard of medical causation, the

superintendent averred that, if a trooper "is found to have 'suffered injury * * * in the performance of his or her duties,' a superintendent *has no discretion at all* to deny a disability pension." He cautioned, however, that a superintendent has discretion "in considering whether a trooper's injuries arose 'in the performance of his or her duties' and it is precisely there that [he] found Trooper Donnelly-Taylor's application lacking because his disabling injury resulted from his assault of Mr. Monsanto, which was indisputably not within his duties." Finally, the superintendent reiterated his statement that he had not disregarded the available medical evidence, pointing to his extensive discussion and review of Dr. Kaufmann's progress notes.

The Superior Court reheard the parties' cross-motions for summary judgment on July 1, 2022. In a bench decision issued on January 9, 2023, a second hearing justice found that the superintendent's "supplemental decision did little to offer additional findings of fact and law to support his original decision." Because the hearing justice concluded that the superintendent's decisions were "arbitrary and capricious and irrational," the hearing justice reversed the superintendent's denial of the trooper's request for a disability pension and remanded the matter with instructions to grant the trooper's request "retroactive to the date of his application forthwith." The Superior Court entered final judgment—in favor of the state, on counts one and two of the complaint, and in favor of the trooper on count three—on

- 18 -

February 1, 2023.  The state filed a premature but valid notice of appeal on January 31, 2023.

## II

### Standard of Review

Whether a state police officer is eligible for a disability pension is a question reserved to the superintendent of the state police, subject to the governor's confirmation.  *See* § 42-28-21(a).  Because "the superintendent ha[s] great discretion" over this question, the Superior Court reviews the superintendent's grant or denial of a request for a disability pension under an arbitrary-or-capricious standard. *Canario*, 752 A.2d at 479.  This same deferential standard guides our review of the superintendent's decision on appeal.

## III

### Discussion

The state argues on appeal that the superintendent's denial of the trooper's request for a disability pension was not arbitrary or capricious and therefore should have been affirmed.  Trooper Donnelly-Taylor presents multiple counterarguments, all of which boil down to the basic contention that the superintendent exceeded his authority under § 42-28-21(a) in denying the trooper's request.

Throughout the life cycle of this case, there has been little dispute regarding the standard of review that applies to a superintendent's decision to grant or deny a

- 19 -

request for a disability pension under § 42-28-21(a).  Where the core disagreements arise over the standard is in its application.  Our first task, then, is to add content to the arbitrary-or-capricious standard.

In *Goncalves v. NMU Pension Trust*, 818 A.2d 678 (R.I. 2003), we reviewed a pension administrator's interpretation of a pension plan under an arbitrary-or-capricious standard. *Goncalves*, 818 A.2d at 682-83.  We explained that, when applying this standard, reviewing courts should determine whether "the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence," i.e., "evidence *reasonably* sufficient to support a conclusion." *Id.* at 683 (quoting *Doyle v. Paul Revere Life Insurance Co.*, 144 F.3d 181, 184 (1st Cir. 1998)).  We further advised that a reviewing court should neither "substitute its own judgment for that of the administrator, nor disturb an administrator's interpretation of a plan so long as it was reasonable." *Id.*  On the question of reasonableness, we wrote that "it is irrelevant whether a reviewing court agrees with the administrator's interpretation or whether * * * another reasonable interpretation" is offered. *Id.*  A reviewing court should uphold an administrator's decision, we concluded, if it was "rational" and "reasonable with no abuse of discretion." *Id.* (quoting *Coleman v. Metropolitan Life Insurance Co.*, 919 F. Supp. 573, 581 (D.R.I. 1996)).

Although we find ourselves now in a different context, our discussion of the arbitrary-or-capricious standard in *Goncalves* is no less instructive. We first address the superintendent's authority under § 42-28-21(a) and the nature of his discretion. Section 42-28-21(a) entitles to a disability pension any state police officer who has "in the course of performance of his or her duties suffered injury causing disability or death[.]" The superintendent's discretion under the statute, great as it may be, does not authorize a superintendent to withhold disability pensions from applicants found to have suffered disabling injuries in the course of performance of their duties. What it does authorize, however, is a superintendent to make the underlying finding, subject, of course, to arbitrary-or-capricious review.

In the present case, the superintendent determined that, although the trooper had suffered disabling injuries, he had not proven that his injuries were suffered in the course of performance of his duties. That decision is one the superintendent was authorized to make, and furthermore, we conclude that it was rational, logical, and supported by substantial evidence. The superintendent did not refute—indeed, he accepted—Dr. Kaufmann's opinion that the trooper was "medically disabled from his prior work capacity" and that his disabling injuries were suffered "as a direct consequence to experiences while employed as a" state trooper. According to Trooper Donnelly-Taylor, the superintendent's acceptance of this uncontradicted medical opinion "should have been conclusive" of his entitlement to a disability

pension under § 42-28-21(a). The statute does not ask, however, whether an applicant's injuries were suffered as a direct consequence to experiences while employed as a state trooper; it asks whether an applicant's injuries were suffered in the course of performance of their duties. *See* § 42-28-21(a). And it is between these separate constructions that the superintendent rationally perceived a distinction.[4]

In our view, the evidence before the superintendent was reasonably sufficient to support a conclusion that Trooper Donnelly-Taylor's assault of Monsanto was the "moment * * * from which his injuries arose[.]" *Canario*, 752 A.2d at 480. Indeed, the superintendent's initial written decision contains a thorough consideration of the relevant law and facts, including the available medical evidence, and the arguments that Trooper Donnelly-Taylor presented in his post-hearing memorandum. One need not agree with the superintendent's denial of the disability pension to recognize that it was scarcely irrational for him to conclude that, had the trooper not assaulted Monsanto and been held accountable for his actions, he would not have experienced the disabling stress for which he now requests a disability pension.

---

[4] We pause to note that, even if Dr. Kaufmann had written that the trooper's disabling injuries were suffered in the course of performance of his duties, the superintendent would have retained discretion to deny the trooper's request for a disability pension. Contrary to the diagnosis of a disabling injury, whether a trooper was in the course of performance of their duties at a given time is not an issue upon which a medical professional like Dr. Kaufmann has expertise.

We further regard as reasonable the superintendent's conclusion that, when the trooper assaulted Monsanto, "he was not engaged in a duty status," *Canario*, 752 A.2d at 480, and therefore his disabling injuries were not suffered in the course of performance of his duties as a state police officer. In support of this conclusion, the superintendent cited *Rhode Island Troopers Association*, in which we passed favorably upon the attorney general's determination that the trooper's assault of Monsanto "fell outside the scope of his employment as a" state police officer. *Rhode Island Troopers Association*, 187 A.3d at 1104. The specific legal issues and travel may be different in this case, but the facts are not. The superintendent had reasonable grounds, in light of *Rhode Island Troopers Association* and the facts that informed our decision there, to conclude that Trooper Donnelly-Taylor's assault of Monsanto was not in the course of performance of his duties as a state police officer.

Because the superintendent's decision was rational, logical, and supported by substantial evidence, we hold that his denial of Trooper Donnelly-Taylor's request for a disability pension was neither arbitrary nor capricious and therefore should have been upheld.

## IV

## Conclusion

For the foregoing reasons, we reverse the Superior Court's grant of summary judgment in favor of the plaintiff on count three, and we remand with instructions to

- 23 -

enter judgment in favor of the defendants on count three. The papers in this case may be remanded to the Superior Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Rhode Island Troopers Association et al. v. State of Rhode Island, Division of the State Police, et al. |
| **Case Number** | No. 2023-113-Appeal. (PC 19-11054) |
| **Date Opinion Filed** | June 27, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kevin F. McHugh |
| **Attorney(s) on Appeal** | For Plaintiff: Carly Beauvais Iafrate, Esq. |
| | For Defendants: Vincent F. Ragosta, Jr., Esq. |