DECISION
Before this Court is a consolidated dispute concerning a decision of the Pawtucket City Council which denied Plaintiff Eric Mutter's (Plaintiff or Mutter) application for disability pension benefits.[1]
Through his Complaint, the Plaintiff sought declaratory relief regarding his rights under the City's ordinance, an injunction compelling the City to follow its ordinance *Page 2 
relating to disability pensions, and a writ of mandamus demanding the City award him disability pension benefits. Jurisdiction is pursuant to G.L. 1956 §§ 8-2-13 and 8-2-16 and G.L. 1956 § 9-30-1 et seq.
 I Facts Travel
This case was tried before the Court on an agreed statement of facts. On September 23, 1990, Mutter was hired as a firefighter in the City of Pawtucket's Fire Division. He was employed in this capacity for a period of nine years until his termination on May 19, 1999. During this time, Mutter served as an Emergency Medical Technician. Between 1997 and 1999, the City became aware of medical conditions Mutter faced on the job, and which sometimes rendered him incapable of performing his duties. Notably, Mutter suffered from anxiety attacks and chronic depression resulting from traumatic work-related incidences.
On Friday, June 20, 1997, after failing to find another employee to substitute for him in his shift that day, Mutter sought help for a drug problem from the City's Fire Division Command Staff.[2] His ongoing difficulties were documented by Fire Chief James T. Condon (Chief Condon). In a mutual effort to correct and rehabilitate Mutter, the City sent Mutter to various treatment facilities.[3] These efforts proved unsuccessful; Mutter's chronic depression, anxiety, and substance abuse persisted. After conferring with his collective bargaining representative, the Pawtucket Firefighters Independent Union (Union) and the City, Mutter agreed in writing to submit to drug testing, no more than twice per year, for the following two years. *Page 3 
Pursuant to the agreement, Chief Condon ordered Mutter to report for a drug test on August 8, 1997. Mutter failed to keep his appointment with Condon to take this test; rather, he sought help at Roger Williams Hospital where he was admitted for inpatient alcohol detoxification. He subsequently was admitted into — and successfully completed — a 30-day residential program at Talbot Treatment Center. As a result of his initial failure to report on demand for his August 8 drug test, Mutter was again disciplined with a thirty-day unpaid suspension, which included time during which he was receiving treatment. In light of his persevering condition, the City offered to place Mutter on a disability pension in September of 1997.[4] Mutter preferred to work while being treated for his condition and did not accept the City's accommodation.
On September 29, 1997, Mutter and the Union undertook a "last chance agreement" (LCA) with the City which recognized Mutter's prior disciplinary violations, his battle with substance and alcohol abuse, and his commitment to treating those problems while performing his duties as a firefighter. In essence, the City agreed to withhold processing dismissal papers against Mutter in exchange for his commitment to abide by the terms of the LCA. Although the LCA outlined Mutter's obligations with respect to counseling, random drug testing by the City, and the consequences of his failure to abide by its terms, the City concedes that the LCA itself did not specifically address any of Mutter's pension rights under Chapter 59 of the Code of the City of Pawtucket (the ordinance) or his Union contract.
In early-January 1998, Mutter was disciplined for an absence without leave that took place on December 31, 1997, and which resulted in a three-day unpaid suspension. The following month, Mutter also misused his available sick time, missing four scheduled work days while failing to respond to three phone calls from Chief Condon over a period of two days. *Page 4 
Chief Condon ordered Mutter to his office on February 10, 1998, and ordered him to obtain documentation regarding the nature of the illness that caused his absence in the preceding days. The following day, Mutter produced a letter from a physician stating that he suffered from depression and anxiety.[5]
On May 4, 1999, notably more than one year after the previous incident, Mutter failed to report for duty. In a letter dated May 10, 1999, Chief Condon notified Mutter that his recent absence and poor job performance prompted his suspension without pay pending review for possible termination by the Personnel Board. On the same day, Condon required Mutter to submit to a drug test per the LCA, for which he reported as ordered. Mutter was notified via letter dated May 11, 1999, that he would face a formal hearing on May 19, 1999, regarding absence without leave and conduct prejudicial to the discipline of the department arising out of the May 4 incident.
On May 17, 1999, two days prior to his scheduled hearing, Mutter filed a request for a pension due to a stress-related disability. To support his application, he provided a letter from Dr. Susan DiMase, his treating physician for the previous year, which stated that Mutter suffered from depression and generalized anxiety order. She stated that Mutter "has developed rapidly increased anxiety due to the conditions in his work place and they [sic] type pf [sic] work that he must preform [sic]." Additionally, she commented that "[his condition] has reached the point where he is now unable to work." On the same day that Mutter filed his application, he asked Chief Condon to cancel his scheduled termination hearing. Condon refused this request. *Page 5 
The City learned on May 18, 1999, that Mutter's recent drug test yielded positive results for cocaine. On May 19, 1999, Mutter failed to appear at his scheduled hearing and Chief Condon notified him in writing that he was terminating his employment based on the applicable provisions of his LCA.[6] The Union filed a June 1, 1999 grievance with the City pursuant to the terms of its collective bargaining agreement (CBA). It alleged that Mutter's discharge was without merit or just cause and did not reflect the parties' past practices or the Fire Department's Rules and Regulations. After Chief Condon denied the Union's grievance on the same day it had been filed, the Union requested a meeting with the City's Public Safety Director pursuant to the CBA's grievance and arbitration procedures. On June 7, 1999, John T. Gannon, Mutter's counsel, requested that his client receive an evaluation by the City's physician so that he might proceed with his disability claim.
During the latter half of 1999, and into February of 2000, the Union's grievance of Mutter's termination overlapped with Mutter's pursuit of a disability pension from the City.[7] On July 7, 1999, Mutter was examined by a physician engaged by the City, Daniel S. Harrop, M.D. Doctor Harrop concluded, in part, that "[h]e is not, however disabled for most occupations where he would not be called upon to care for another person's life. There are hundreds of other occupations he can therefore do." *Page 6 
On July 20, 1999 the City, through its solicitor, Margaret Lynch, denied Mutter's application based on Dr. Harrop's report. The City commented that his alcohol dependency problem, if any, is not caused by job-related stress, and he does not suffer from depression or anxiety. Soon thereafter, Mutter's counsel requested that a third, neutral physician, examine Mutter pursuant to Section 59-25 of the ordinance. In response, the City contended that an examination by a third physician was not necessary and, therefore, it did not consent to the additional examination. Through its counsel, the City asserted that neither Dr. Harrop's report, nor the report of Dr. DiMase — submitted by Mutter in support of his application — conclusively found that Mutter was totally and permanently disabled. On September 10, 1999, at the request of Mutter's counsel, Dr. DiMase submitted a clarification of her initial opinion, stating as follows:
 "It is my medical opinion then as it is now that Mr. Mutter is without a doubt totally and permanently disabled from performing any firefighting duties. Furthermore, Mr. Mutter's depression and anxiety disorder have been directly caused by the conditions that he has experienced int he [sic] work place."
On October 5, 1999, Mutter filed C.A. No. 99-5123, his first Complaint in this consolidated dispute. He sought an injunction to compel the City to comply with its ordinance as well as a writ of mandamus which would obligate the City to issue him a disability pension, or alternatively, require an examination by a third physician.[8] A Justice of the Superior Court issued a bench decision on September 5, 2000, regarding Mutter's request, in which the Court ordered that Mutter be evaluated by a third physician pursuant to the ordinance. The Court also *Page 7 
concluded that further disputes regarding Mutter's pursuit of a disability pension must be resolved via the grievance provisions of the CBA.
Thereafter, Dr. Debra J. Solomon was selected by Mutter's two other examining physicians to perform his third evaluation. Doctor Solomon met with Mutter on December 14, 2000, for over two and one-half hours, and the details of such meeting shall be addressed later in this Decision. Importantly, she concluded that Mutter was "totally disabled" from performing work as a firefighter, and "would likely remain indefinitely unable to return to this line of work." After this third evaluation, the City again denied Mutter's request for a disability pension on March 7, 2001, asserting that his violation of the LCA served as disqualification for the receipt of a disability pension. Per the Court's previous order, Mutter submitted a grievance to Chief Condon on March 26, 2001, regarding the City's denial of his application. The Chief denied this grievance on April 2, 2001, prompting Mutter to seek recourse in arbitration through his Union; however, the Union also refused to pursue this grievance on Mutter's behalf.
On October 11, 2001, Mutter amended his Complaint to add a final count seeking declaratory relief. Mutter sought the Court to declare that he possessed rights under the ordinance that were independent of the CBA. The parties filed cross-motions for summary judgment. In addressing the parties' motions, a Justice of the Superior Court made specific findings of fact and conclusions of law as required by the Uniform Declaratory Judgment Act, § 9-30-1 et seq.[9] Notably, the Motion Justice determined that Mutter could pursue his rights to a disability pension under the provisions of the ordinance.
The Motion Justice first concluded that the ordinance affords rights to pursue such a pension independent of those provided by the CBA, and determined that any recourse available *Page 8 
via the CBA had come to an end when the Union refused to pursue Mutter's grievance. She also found that a disability pension is a property right which vests at the date of the employee's injury. The Motion Justice further declared that the LCA was not specific enough for the Court to hold, as a matter of law, that Mutter's termination two days after submitting his application extinguished his right to any potential disability benefits. Consequently, the Motion Justice concluded that after having been examined by three physicians and having his disability claim denied by the City, Mutter had to return to the proper authority within the City — as outlined in the ordinance — to receive a final determination on his benefits.
Mutter complied with this order, and on January 12, 2004, his application was presented to the Pawtucket City Council Claims Committee (the Claims Committee). On the same day, after hearing from counsel, followed by a closed session to discuss the matter, the Claims Committee denied Mutter's petition. Later that month, on January 21, 2004, the Pawtucket City Council (City Council) accepted the Claims Committee recommendation without discussion, thereby denying his request for total and permanent disability benefits.
On February 4, 2004, Mutter filed a second action, C.A. No. 04-0589, in the Superior Court. This time, Mutter named the members of the City Council in their official capacities as defendants.[10] In his Complaint, Mutter again sought a writ of mandamus, injunctive relief, and declaratory relief. In March 2004, this second action was consolidated with Mutter's initial 1999 Complaint. Thereafter, any actions taken by or against individual representatives of the City were directed at the municipality. *Page 9 
Between December of 2004 and September of 2005, the parties conducted depositions of Mutter, Robert E. Carr, Chairman of the Claims Committee, and all three physicians who had opined on Mutter's condition. On March 30, 2006, the City filed a motion for summary judgment on the following grounds: (1) section 59-10 of the ordinance provides for Mutter's forfeiture of disability benefits; (2) Mutter does not have standing to bring his action because the pursuit of a disability pension is governed by the CBA; and (3) the City was justified in refusing Mutter's application based on the inconsistent histories Mutter provided to his three examining physicians. The Motion Justice issued a November 3, 2006 bench decision denying the City's motion. In it, the Motion Justice observed that the Court had previously ruled on issues (1) and (2), and with respect to issue (3), found that genuine issues of material fact existed, which precluded summary judgment in favor of the City.
Thereafter, Mutter filed his own motion for summary judgment on February 12, 2007. Mutter asserted that the City's reasons — or lack thereof — for denying his pension were arbitrary and capricious. He further argued that because he met all requirements for a disability pension under the ordinance, the City Council had no discretion to deny his application. The parties appeared before the Motion Justice once again on September 19, 2007, at which time the Court issued another bench decision. The Court denied Mutter's motion for summary judgment. Further, the Court declared that the City's ordinance afforded the City Council discretion in evaluating the evidence presented in support of an employee's application for disability benefits. Because the ordinance was characterized as discretionary and the City Council was entitled to ascertain the reliability of medical reports submitted in support of a pension application, the Motion Justice found that genuine issues of material facts existed with respect to the issuance of Mutter's pension. *Page 10 
This matter now appears before the Court for trial, and by agreement of the parties, has been submitted for adjudication on an agreed statement of facts.
 II Standard of Review
It is axiomatic that a plaintiff — in this case, Mutter — has the burden of satisfying the Court by a preponderance of the evidence as to all of the claims. In this matter, "the trial justice sits as the trier of facts as well as of law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). Because the parties submitted an agreed statement of facts for this Court's evaluation, the Court does not have an independent fact finding function. See Hagenberg v. Avedisian, 879 A.2d 436, 441 (R.I. 2005); see also Randall v. Norberg, 121 R.I. 714, 717-18, 403 A.2d 240,242 (1979). While it may not look beyond the undisputed record to reach its decision, the Court is not precluded from drawing inferences reasonably and logically embraced by the agreed statement. SeeRandall, 121 R.I. at 718, 403 A.2d at 242 (citations omitted). Thus, after reviewing the evidence, the trial justice must "find the facts specifically and state separately its conclusions of law thereon." Super. R. Civ. P. Rule 52(a). "Even brief findings will suffice as long as they address and resolve the controlling factual and legal issues."White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983) (citing J.W.A. Realty,Inc. v. City of Cranston, 121 R.I. 374, 384, 399 A.2d 479, 484-85
(1979)).
The Court hereby adopts as its findings the Agreed Statement of Facts in its entirety as submitted by the parties. It shall now address the merits of the case. *Page 11 
 III Declaratory and Injunctive Relief
The Plaintiff seeks the Court to declare that he has satisfied the requirements of the City's ordinance, which would thereby entitle him to a disability pension. In failing to recognize that he had fulfilled the prerequisites to obtaining a disability pension, Mutter asserted that the City Council acted arbitrarily and capriciously in denying his application. Therefore, Mutter asks this Court to compel the City to award him a full disability pension just as other firefighters who had sought and recovered relief in similar situations, and that said pension be awarded retroactively to the date of his initial application.
A declaratory judgment is a method by which a party may petition the Court for a declaration of rights, status, or other legal relations when such determinations hinge upon a statute. See § 9-30-1 et seq. Thus, "the Superior Court has jurisdiction to construe the rights and responsibilities of any party arising from a statute pursuant to the powers conferred upon [it] by G.L. chapter 30 of title 9, the Uniform Declaratory Judgments Act." Canario v. Culhane, 752 A.2d 476, 478-79
(R.I. 2000). Specifically, § 9-30-2 of the Uniform Declaratory Judgments Act (the UDJA) provides as follows:
 "Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or legal relations thereunder." (Emphasis added.)
"This statute gives a broad grant of jurisdiction to the Superior Court to determine the rights of any person that may arise under a[n ordinance] not in its appellate capacity but as a part of its original jurisdiction."[11] Canario, 752 A.2d at 479 (citing Roch v.Harrahy, 419 A.2d 827, 830 *Page 12 
(R.I. 1980)). Further, this Court acknowledges that the purpose of the UDJA is "to allow the trial justice to `facilitate the termination of controversies.'" Bradford Assocs. v. R.I. Div. of Purchases,772 A.2d 485, 489 (R.I. 2001) (citations omitted).
 A Standard of Review Applied to City Council's Decision
In order to assess the City's obligations under its ordinance and Mutter's rights to a disability pension, the Court must first determine the applicable standard of review. See Canario, 752 A.2d at 479 (finding pursuant to powers under § 9-30-2, Superior Court had jurisdiction to determine plaintiff's entitlement to disability pension under facts and circumstances of case having largely undisputed facts). "[W]hen the [pension] benefit plan gives the administrator or fiduciary discretion to determine benefit eligibility or construe plan terms . . . a deferential `arbitrary and capricious' standard of judicial review" is employed to review those determinations. See Recupero v. New EnglandTel. Tel. Co., 118 F.3d 820, 827 (1st Cir. 1997) (citing toFirestone Tire Rubber Co. v. Bruch, 489 U.S. 101 (1989) and its progeny for authority); see also Goncalves v. NMU Pension Trust,818 A.2d 678, 682 (R.I. 2003). This standard of review has been applied to plans covered under the Employee Retirement Income Security Act (ERISA).Id. Similarly, the "arbitrary and capricious" standard of review also has *Page 13 
been utilized in federal courts when evaluating trustees' determinations under Labor Management Relations Act (LMRA) pension plans even though that statutory scheme does not explicitly authorize review of such determinations. See Firestone, 489 U.S. at 109-11.
Like the LMRA statutory scheme, the City's ordinance does not provide a framework within which an applicant may appeal an adverse determination for pension benefits. It follows that the City's ordinance, therefore, would be silent — and actually is silent — as to a standard of review applicable to any such appeal. The policy considerations found in the ERISA and LMRA cases, however, demand that an "arbitrary and capricious" standard of review should be equally applicable to this case. That is because, like a trustee who exercises discretion under a trust instrument, the City Council exerts similar discretion in determining disability pension eligibility by adhering to the terms of its ordinance.[12] See Pawtucket Code § 59-2 (providing City Council with authority to place individuals on pension roll);see also § 59-24 (demanding City Council consider three physicians' reports); § 59-25 (permitting City's Personnel Board to require re-examination of disability benefit recipient to ensure continuing eligibility); Lakey v. Remington Arms Co., 874 F.2d 541, 544 (8th Cir. 1989) (demonstrating language granting administrator discretionary authority over eligibility need not be expansive or overly broad). For these reasons, the Court will review the City Council's decision applying the arbitrary and capricious standard and will reverse that decision if it actually was arbitrary and capricious, or constituted an abuse of discretion. See Doyle v. Paul Revere Life Ins. Co.,144 F.3d 181, 183-84 (1st Cir. *Page 14 
1998) (commenting eligibility determination normally upheld unless "arbitrary, capricious, or an abuse of discretion") (citations omitted).
Essentially, "`when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" Coleman v. Metropolitan Life Ins. Co.,919 F. Supp. 573, 581 (D.R.I. 1996) (citations omitted). Thus, "when reviewing a decision made under the arbitrary and capricious standard, the court's role is limited to assessing whether determinations were made rationally and in good faith — not whether they were right." Goncalves v. NMUPension Trust, 818 A.2d 678, 683 n. 3 (R.I. 2003) (citations omitted). Such determinations inevitably must incorporate the appropriate factual findings. Id. At 682 (recognizing body with discretionary authority has power to make appropriate factual findings). Accordingly, it is essential that "some sort of record [was] compiled of the findings of fact and conclusions of law on which the * * * council based its action." Eastern Scrap Servs., Inc. v. Harty, 115 R.I. 260, 263,341 A.2d 717, 719-20 (1975). Furthermore, the fact that a reviewing body chooses one medical opinion over another medical opinion in making its determination does not by itself establish arbitrary and capricious behavior on the part of that body. See Coleman, 919 F. Supp. at 582. However, when a decision fails to offer sufficient reasons for treating similar factual situations differently, a board's decision may be considered arbitrary and capricious. See Yetman v. Garvey, 261 F.3d 664,669 (9th Cir. 2001).
 B Denial of Applicant's Request for Total and Permanent Disability Pension
Mutter contends that the City Council acted arbitrarily and capriciously when it denied his application because it ignored doctors' reports stating that he could not perform firefighting duties. He further asserts that the City Council erroneously relied upon alleged "inconsistencies" *Page 15 
in his statements to doctors in order to justify its denial of his application. The record reveals that Mutter was examined by three physicians during the pertinent period.
Mutter regularly visited Dr. Susan DiMase, a licensed psychiatrist and his treating physician. She saw Mutter for the year prior to his May 1999 termination, and reported that her initial meeting with Mutter occurred on January 12, 1998. It appears that Mutter made frequent visits to her office between that time and October 9, 1998. Apparently, however, he missed a scheduled appointment in January 1999. When he filed his application in May of 1999, Mutter enclosed a letter from Dr. DiMase stating that he suffered from depression and generalized anxiety disorder. She commented that he "has developed rapidly increased anxiety due to the conditions in his work place and they [sic] type pf [sic] work that he must preform [sic]." Further, Dr. DiMase stated that his illness "has reached the point where he is now unable to work."
In July of 1999, the City requested that Mutter consult with a physician engaged by the City, Dr. Daniel S. Harrop. The City provided Dr. Harrop with a list of questions and a timeline relating to Mutter's behavior and the disciplinary measures taken against him by the Fire Department.[13] Doctor Harrop also received copies of other medical documents relating to Mutter: the May 17, 1999 letter from Dr. DiMase that accompanied Mutter's disability application; a one-page handwritten note from Mutter's therapist, David Swain, [14] confirming that Mutter was treated by him during the period from July 25, 1997 through December 18, 1998; and *Page 16 
a short typed statement by Razib Khaund, M.D., Mutter's primary-care physician, in which he acknolwedged that Mutter was being "followed" by Dr. DiMase for work-related stress.
Doctor Harrop provided an opinion of Mutter's condition by a letter dated July 8, 1999. During his consultation, Mutter told Dr. Harrop that he did not experience any psychiatric or substance abuse problems until approximately five or six years earlier. Mutter stated that he drank alcohol after each workday, did not accept overtime unless it was with his regular partner, and avoided other firemen in efforts to isolate himself and deflect work-related discussions. He reported that he occasionally mingled drugs with alcohol, but that alcohol was his "drug of choice." Mutter said that the state of his marriage concerned him; he felt he relied too much on his wife to alleviate some of his burdens by pressuring her to listen to his work-related problems.
When asked about the success of his previous treatments, Dr. Harrop stated in his report that Mutter characterized his prior treatment as "so-so," and he admitted that he had been "using" until March — presumably, March of 1999 before this examination took place. Since then, Mutter told Dr. Harrop that he went to Alcoholics Anonymous daily, kept up with regular therapy, and avoided bars to concentrate on being sober. Doctor Harrop determined that Mutter did not show evidence of PTSD (post traumatic stress disorder), but did suffer from alcoholism. Doctor Harrop also concluded as follows:
 "I suggest that he does not return to the job that he has had. I think the alcohol dependency problem, whatever its origin, prevents that. He is not, however, disabled for most occupations where he would not be called upon to care for another person's life. There are hundreds of other occupations he can therefore do. To your specific questions about Mr. Mutter's anxiety and depression, I find no evidence of depression and anxiety."
Based on the reports of Doctors Harrop and DiMase, the City denied Mutter's initial application, stating that his alcohol dependency problem, if any, was not caused by job-related stress, and that he did not suffer from depression or anxiety. *Page 17 
On September 10, 1999, Dr. DiMase clarified her opinion on Mutter's disability. She stated, that Mutter "is without a doubt totally and permanently disabled from performing any firefighting duties." Thereafter, Mutter was examined for a third time pursuant to a Court order directing the City to provide Mutter with a third examination. Per the ordinance, Doctors DiMase and Harrop chose Dr. Solomon to perform this final evaluation.
Mutter told Dr. Solomon that work became more difficult in 1992 and 1993, and recalled two traumatic calls which rendered him helpless: the murder of a baby by his father, and the suicide by hanging of a friend. Mutter reported recurrent memories and distressing dreams of these events. He said that memories of the call to the baby's rescue lingered, particularly because he testified in court and was threatened by the baby's murderer.
Mutter reported intense anxiety and immobilizing panic attacks upon certain triggers, such as hearing the emergency alarm or smelling substances common to emergency sites. He complained of insomnia and irritability, and stated that he became easily startled, dreaded his shifts, and began avoiding other firemen as well as overtime work. Mutter said that he used alcohol to cope, and by 1997, sought help through various programs. Mutter stated that 1998 and 1999 were particularly difficult, as his mother called him to rescue his sister, who died despite his efforts. After a period of renewed drinking, he said that he had been sober since April 1999. Mutter told Dr. Solomon that although he physically was able to do some work, he still experienced recollections and nightmares of traumatic experiences on the job. Based on this meeting with Mutter, Dr. Solomon evaluated him as follows:
 "Mr. Mutter's history and symptoms clearly indicate that he suffers from a Post Traumatic Stress Disorder (P.T.S.D.), now chronic, which is clearly, directly, and specifically related to his duties as a firefighter with the Pawtucket Fire Department. Because his symptoms continue to be brought about by stimuli related to his work as a firefighter, Mr. Mutter continues to be totally disabled from performing such work. Because of the specificity and chronicity of his *Page 18 
stimuli-related symptoms even several years after his traumatic exposures, Mr. Mutter will likely remain indefinitely unable to return to this line of work. This inability is not related to alcohol or drugs. Mr. Mutter developed an alcohol problem secondary to the P.T.S.D. His P.T.S.D. symptoms have persisted for two years even in the absence of alcohol."
After receiving the final of three physicians' opinions, the City Council's Claims Committee recommended that the City Council deny Mutter's application. Notably, Councilman Carr stated as follows:
 "I'll start off by saying that I don't think that this is the type of situation that should result in disability pension. I think we should take every legal avenue available to prevent what I believe would be a travesty. That fact that Mr. Mutter's own union refused to pursue a grievance regarding the denial of the disability pension speaks volumes. As to whether Mr. Mutter is legally entitled to a disability pension, I think that remains to be seen after further litigation. As a fact finder I discount the medical reports because they are based on inconsistent information provided by Mr. Mutter. I think we need to give the City's attorney an opportunity to explore the basis of these reports. As for Dr. Harrop's report I note that [the Motion Justice] states on the bottom of page 16 that `the language is not very clear and for somebody to make a final determination it seems to me that you have to explore that a little further' . . . I think we should also give the City's attorney to challenge [sic] the legal rulings . . . So my recommendation to the Committee is that we deny the pension and let the case proceed in court." See Exhibit 44, Agreed Statement of Facts, Transcript of January 12, 2004 Pawtucket City Council Claims Committee Hearing (Tr.) at 23-24.
The City Council accepted the Claims Committee's recommendation without discussion.[15]
The record indicates that at the time the City Council adopted the Claims Committee's recommendation to deny Mutter's application, it also adopted the Claims Committee's three main reasons for doing so. First, it believed that Mutter's breach of his LCA agreement disqualified him from receiving any pension benefits. (Tr. at 12.) The Claims Committee also believed that Mutter improperly pursued the denial of his application before the Court instead of *Page 19 
in accord with his CBA. (Tr. at 14.) Finally, the Claims Committee questioned the reliability of the medical reports through which it was required to evaluate Mutter's application. (Tr. at 12-14.) It should be noted that the validity of the first two reasons offered by the City Council have been addressed by the Motion Justice earlier in the travel of this case.
A municipal council's findings of fact are essential to its decision, particularly when evidentiary conflicts abound. See Cullen v. TownCouncil of the Town of Lincoln, 850 A.2d 900, 904 (R.I. 2004). Faced with insufficient findings, the Superior Court possesses the authority to remand the case to the City Council for further proceedings "to correct deficiencies in the record and thus afford the litigants a meaningful review." Lemoine v. Dep't of Mental Health, Retardation Hosps., 113 R.I. 285, 290, 320 A.2d 611, 614 (1974). Indeed, a board "must do more than make a motion and take a vote." Sambo's of R.I.,Inc., 431 A.2d at 1193.
While a justice of this court has previously determined that the City Council has inherent discretion to evaluate the validity of the reports accompanying an applicant's disability request, at the time of its decision, the Council made no more than a blanket statement that Mutter provided "inconsistent" histories in order to discredit the physicians' reports. Such a "finding" was insufficient for this Court to perform a meaningful review; however, while the Court may remand a matter to a reviewing board, such an action need not be taken in this case.
First, this is not an appeal falling within the purview of the APA. In addition, the Court recognizes that its role in assessing a party's complaint for declaratory judgment entails "`facilitat[ing] the termination of controversies.'" See Bradford Assocs., 772 A.2d at 489
(citations omitted). Neither party suggests that a remand to the City Council would be an appropriate method of terminating this dispute. Indeed, the parties themselves submitted this matter to the Court for a decision on the merits upon an agreed statement of facts. Included in *Page 20 
the exhibits thereto, were depositions of Mutter, Councilman Carr, and all three of the physicians that opined on Mutter's condition. This evidence is relevant in determining whether Mutter met the prerequisites set forth in the ordinance to obtain a disability pension.
The Court views an ordinance in light of the established rules of statutory construction. "It is well settled that the rules governing statutory interpretation are equally applicable to the interpretation of an ordinance." Jones v. Rommel, 521 A.2d 543, 544-45 (R.I. 1987). "`[W]hen the language of a statute is clear and unambiguous, [the court] must enforce the statute as written by giving the words of the statute their plain and ordinary meaning.'" Park v. Rizzo Ford, Inc.,893 A.2d 216, 221 (R.I. 2006) (quoting Gem Plumbing Heating Co. v. Rossi,867 A.2d 796, 811 (R.I. 2005)). Therefore, "in the absence of an ambiguity, this [C]ourt must give the words of the statute `their literal and plain meaning.'" State v. Lough, 899 A.2d 468, 470 (R.I. 2006) (quotingState v. Oliveira, 432 A.2d 664, 666 (R.I. 1981)). However, if an ambiguity exists in the statute, a court "must apply the rules of statutory construction and examine the statute in its entirety to determine the intent and purpose of the Legislature." Harvard PilgrimHealth Care of New England, Inc. v. Rossi, 847 A.2d 286, 290 (R.I. 2004).
Section 59-24 provides that a member who becomes totally and permanently disabled from an illness or injury suffered either performing his or her duty or otherwise — essentially, becoming disabled from any cause — shall receive certain disability benefits.See § 59-24(A) and (B). Section 59-25 of the City's ordinance requires that the disability determination be "made upon the basis of reports on examinations made by three physicians. . . ." See Pawtucket Code § 59-25(A). Subsection (B) of § 59-25 mandates that the determination of disability be made with respect to the applicant's incapacity to perform "normal service." *Page 21 
While Councilman Carr's comments do not indicate which "inconsistencies" in the record troubled the City Council, Attorney Robert Brooks's earlier remarks on the record shed some light on why the City Council questioned the reliability of the doctors' opinions. The first alleged inconsistency involved the doctors' varying characterizations of Mutter's ailment. Attorney Brooks observed that Dr. DiMase opined that Mutter suffered from depression and anxiety disorder; Dr. Solomon concluded that Mutter suffered from PTSD, and Dr. Harrop found that that Mutter suffered from neither of those conditions. Rather, Dr. Harrop concluded that Mutter had an alcohol dependency problem. (Tr. at 12.)
It would not be a fair and liberal construction of the ordinance to conclude that an applicant for disability benefits prove the exact nature of his or her disability by an agreed diagnosis of several doctors prior to receiving benefits. See Dees v. Mississippi River FuelCorp., 192 S.W.2d 635 641-42 (Mo.App. 1946) (commenting exact diagnosis is helpful in understanding probable duration and necessary treatment, but underlying policy supports timely compensation for disability and loss of earning power). The comparison of one doctor's diagnosis with that of another may be characterized as a conflict in the evidence as to Mutter's actual diagnosis; however, it cannot be viewed as a conflict with respect to the conclusion that he suffered from a resulting disability. While the diagnosis is relevant to characterizing the disability as "occupational" or "nonoccupational," the disability itself can be established via differing diagnoses. Therefore, the Court concludes that inconsistencies with respect to Mutter's exact diagnosis should not prevent him from obtaining a disability pension if the diagnoses, whatever they may be, support a finding that he is disabled from normal service as a firefighter. See Pawtucket Code § 59-25(B). *Page 22 
All three of the medical opinions indicated that Mutter was unable to perform firefighting duties. The first, submitted by Dr. DiMase stated that Mutter was "without a doubt totally and permanently disabled from performing any firefighting duties." The second opinion, submitted by Dr. Solomon, stated that Mutter was "totally disabled" from performing work as a firefighter, and based on his stimuli-related symptoms, he "will likely remain indefinitely unable to return to this line of work." Finally, Dr. Harrop suggested that he not return to firefighting, but that there are a multitude of other occupations within which he could work.
At least two of these three doctors — namely, Doctors DiMase and Dr. Harrop — opined that Mutter would not be able to perform further firefighting duties. It matters not that Dr. Harrop concluded Mutter was not disabled from "most occupations where he would not be called upon to care for another person's life." The ordinance does not require that a disability pension be awarded only where an applicant cannot perform any other occupation; rather, it requires a showing that a member is totally and permanently disabled from performing "normal services" of a firefighter. See Pawtucket Code § 59-25(B).[16] Caring for the lives of others was an integral part of Mutter's duties and Dr. Harrop recommended that Mutter not return to such duties. When asked during his deposition whether there was any question that Mutter was disabled from performing firefighting duties on the date of his examination, whatever the cause, Dr. Harrop answered "Correct." (Harrop, Depo. Tr. at 70.) Therefore, at the time of its decision, the City Council had overwhelming evidence that Mutter could no longer perform normal services as a firefighter, even though the various diagnoses that aided such a conclusion differed.
The second inconsistency upon which the City Council based its denial of Mutter's application involved the medical histories he provided to Doctors Harrop and Solomon. The *Page 23 
facts relating to this allegation are found in the doctors' written opinions, as well as in their depositions. Attorney Brooks noted two specific areas in which Mutter allegedly relayed inconsistent information. First, Attorney Brooks observed that Dr. Harrop's report stated that Mutter occasionally mixed drugs with alcohol through his five year span of substance abuse. Similar notations were absent from Dr. Solomon's report when she recorded Mutter's description of abusing alcohol to handle job-related stress. (Tr. at 12-13.) Next, Attorney Brooks faulted Mutter for relaying different accounts as to how he became a firefighter to these doctors. Id. at 13.
In many aspects, the information Mutter provided to Dr. Harrop is not inconsistent with what Mutter told Dr. Solomon. It should be noted that "consistent" is defined as "[i]n agreement; compatible." The American Heritage Dictionary 392 (4th ed. 2000). Alternatively, where something is "inconsistent" with another thing, it is "contradictory" to it, (Id. at 888), or "not compatible with another fact or claim." Black's Law Dictionary 781 (8th ed.). Although he gave different timelines regarding his substance abuse, whether it was with respect to his cocaine use or alcohol consumption, Mutter was not using either drug at the time of his consultations with Doctors Harrop and Solomon. (Mutter, Depo. Tr. at 17.) Mutter reported to each of them that he had not used alcohol since March or April of 1999.[17] Consequently, for the purpose of determining a present disability, the doctors' reports reflected his condition at the time of his visits.
Further, even if Mutter failed to express his recent cocaine use to Dr. Harrop, Dr. Harrop had records of Mutter's disciplinary proceedings at the Department before him. Contained *Page 24 
therein was information relating to Mutter's discharge for testing positive for cocaine. Doctor Solomon also knew of Mutter's cocaine consumption, but could not recall why she left that fact out of her evaluation. (Solomon, Depo. Tr. at 35-37.) When Dr. Solomon diagnosed Mutter in early January of 2001, she did not assess him for substance abuse because he reported that he was not using alcohol or drugs at the time. Id. at 37. This fact is also consistent with Mutter's report of continued sobriety since the time that he applied for his pension. (Mutter, Depo. Tr. at 17.)
In its memorandum, the City indicates that Mutter failed to tell Doctors Harrop and Solomon about a family history of alcohol abuse, but that he disclosed such a history to Dr. DiMase, and admitted the same during his deposition. The City also calls the Court's attention to the fact that Mutter told Dr. DiMase that he had abused alcohol at the age of eighteen. Should the doctors have relied upon these facts to make a diagnosis of a substance abuse disability, as opposed to a stress-related disability, such reliance would have been inconsequential. Based on the ordinance's provisions for granting a disability pension, a disability from "any cause" would have been sufficient to award Mutter a pension.
Similarly inconsequential are Mutter's varied recollections of the time leading up to becoming a firefighter. While the doctors were not given identical accounts of Mutter's educational and employment activities leading up to his employment with the Department, his recitation of these events was not necessarily inconsistent. During his deposition, Mutter confirmed that he did work for his grandfather's steeplejack company and that a friend in politics indeed urged him to pursue a career as a firefighter. (Mutter, Depo. Tr. at 11.) Mutter also confirmed that he was required to pass a test prior to joining the Department. Id. Though these thoughts may have been conveyed to each doctor using different words, the fact that they were *Page 25 
not conveyed in the exact manner does not make them any less true. Consequently, the Court finds that the City Council's heavy reliance on these minor omissions was inappropriate.
Similarly, the City Council faulted Mutter for reciting "different" stories about the traumatic events he witnessed during his employ with the Department. During each of their depositions, however, the physicians recalled some details of these traumatic events, as well as Mutter's avoidance of overtime. Doctor DiMase recalled Mutter telling a story about a murdered baby and a friend who hanged himself; however, she was unaware of his sister's death. (DiMase, Depo. Tr. at 54-55, 33.) Doctor Harrop could not pinpoint any traumatic instances which triggered Mutter's condition, yet Dr. Harrop's deposition indicates that Mutter mentioned distress upon seeing "drowned babies" and others dying in front of him. (Harrop, Depo. Tr. at 19-20.) Doctor Solomon, who spent two and one-half hours speaking with Mutter, reported hearing more detailed accounts of those incidents. (Solomon, Depo. Tr. at 29-30.)
While the City asserts that each doctor's opinion is unreliable because Mutter allegedly gave them inconsistent information, only one doctor — Dr. DiMase — positively states that her opinion on Mutter would have changed if she knew that Mutter was still using alcohol or cocaine at the time she evaluated him. (DiMase, Depo. Tr. at 52-53.) In discussing the sometimes overlapping symptoms of anxiety, depression, and substance abuse, she stated as follows:
 "Is the current alcohol abuse, is he trying to self-medicate the anxiety and depression from the job, or is the substance abuse causing the agitation and anxiety of the job. Certainly whatever the cause is, the alcohol and the cocaine abuse would account for poor performance at work[.]" (DiMase, Depo. Tr. at 53-54.)
During her deposition, Dr. DiMase stated that she would want Mutter to be "clean and sober before determining whether he was going to be able to work." This comment indicates that, at the time of her evaluation, she was uncertain whether he would be able to work in the future. *Page 26 
With this statement, Dr. DiMase confirmed that Mutter indeed suffered from some disabling condition at the time she sent her letters.
Even if the City discounted Dr. DiMase's opinion because she expressly stated that her opinion on Mutter's condition would have changed had she known about his substance abuse around the time that she drafted her May and September letters, the City Council still had before it two opinions which indicated that Mutter was disabled. While Doctors Harrop and Solomon stated that their opinions of Mutter's condition may have changed based on a history of alcohol abuse prior to his service as a firefighter, or after the time he applied for a pension, neither conclusively stated that it indeed would have changed.
Instead, Dr. Harrop confirmed that on the date of Mutter's examination, there was no question in his mind that Mutter was disabled from performing firefighting duties, whatever the cause may have been. (Harrop, Depo. Tr. at 70.) Doctor Solomon, while effectively suggesting that he should be evaluated in the future, Solomon, Depo. Tr. at 39, she could not conclude that any additional information would have changed her opinion on Mutter's diagnosis. Id. at 35, 39. Therefore, Mutter's disability, whether rooted in substance abuse, depression, anxiety, or PTSD, prevented him from performing his normal duties as a firefighter.
During the Claims Committee meeting, Attorney Brooks commented that "99 times out of 100 if all three doctors or two out of three doctors agree[,] the call is made and the employee likely if they are totally and permanently disabled gets the pension." (Tr. at 19.) It is apparent that this situation arose in Mutter's case, but the City Council ignored this evidence and did not provide him with a pension. The record also indicates that the City Council's decision rested largely upon the potential legal challenges it planned to bring regarding the rulings in this case. The inconsistencies cited were not material to the physicians' opinions and would not *Page 27 
conclusively alter their finding that Mutter was disabled. For these reasons, the Court concludes that the City Council's denial of Mutter's application was arbitrary and capricious, thereby prejudicing his substantial rights.[18]
This conclusion is furthered bolstered by the City's awareness of Mutter's condition since September of 1997. It is undisputed that the City offered to place Mutter on a disability pension at that time.See Agreed Statement of Facts at ¶ 9. Therefore, even prior to Mutter's medical examinations, the City had conceded that Mutter suffered from a disability, whether work-related or not, and it further conceded that this pension vested at the time it suggested he take advantage of those benefits. See Bard v. Boston Shipping Ass'n, 471 F.3d 229, 243 (1st Cir. 2006) (commenting fact that employee was working prior to termination does not necessarily mean employee is not totally and permanently disabled from that job). Similarly, the LCA demonstrates that the City understood Mutter's limitations, whether stress-related or stemming from substance abuse.
Based on the entire record, the Court therefore grants Mutter's request for declaratory relief. The Court concludes that Mutter has met the prerequisites for obtaining a nonoccupational disability pension as set forth in the City's ordinance. *Page 28 
Mutter also seeks to have the City to comply with its ordinance and issue him a disability pension. See Gomes v. Wall, 831 A.2d 817, 821
(R.I. 2003); see also Parente v. Southworth, 448 A.2d 769 (R.I. 1982) (permitting claims for both declaratory and injunctive relief in same suit). An injunction is an extraordinary remedy that requires a party either to act or to refrain from acting in a particular situation.O'Connors v. Helfgott, 481 A.2d 388, 394 (R.I. 1984). A party seeking this relief must demonstrate threatened irreparable harm and the non-existence of an adequate remedy at law. Id.; see also Brown v.Amaral, 460 A.2d 7, 10 (R.I. 1983). In addition, the court must "survey the facts and apply the traditional tests for equitable relief. This involves balancing the equities, weighing the hardships to either side, and examining the practicality of imposing the desired relief."R.I. Turnpike Bridge Auth. v. Cohen, 433 A.2d 179, 192 (R.I. 1981);see also Frenchtown Five, LLC v. Vanikiotis, 863 A.2d 1279, 1282 (R.I. 2004) (commenting balancing of equities must favor plaintiff).
Here, Mutter has prevailed on the merits of his claim for declaratory relief; he has satisfied the prerequisites to obtaining a disability pension under the City's ordinance. His success on the merits is a strong factor favoring injunctive relief. Further, Mutter already has expended considerable sums of money pursuing this pension. He no longer has an adequate remedy at law, as he has exhausted his remedies before the City Council by returning to it for a final decision on his application.
The Court, by granting injunctive relief to Mutter, would require the City to provide a former employee with benefits that were not only once offered to him, but also received by other employees facing similar incapacities. The effect of an injunction here would be to provide relief which the Court has already determined Mutter to be entitled. As a result, the Court finds that Mutter has met the traditional tests for injunctive relief. *Page 29 
The City contends that any disability benefit awarded should not stretch beyond the time frame of May 17, 1999, the date of Mutter's application, to May 23, 2007, the day of his death. Mutter does not contest this assertion. Therefore, the City Council is enjoined to comply with its ordinance, and shall award disability benefits to Mutter from the time of his application through the duration of his disability.
 D Spousal Benefits
Karole Mutter seeks a declaration that she is entitled to receive spousal benefits totaling 50% of her husband's highest salary for the remainder of her life per § 59-26 of the City's ordinance. The section to which Ms. Mutter refers provides as follows:
 "A. In the event that a member dies prior to retirement and is survived by a spouse or children, the spouse shall be entitled to a pension benefit equal to 50% of the member's highest or final salary . . . and said benefits shall be continued during the lifetime of the spouse or until he or she remarries." Section 59-26(A).
This provision stands apart from the sections of the Ordinance offering pensions based on disability. See Rocha v. State, 705 A.2d 965, 967
(R.I. 1998) (discussing differences in retirement and disability benefits in state employees' retirement system); see also Pawtucket Code § 59-24(A) (discussing benefits resulting from disability as "disability pension").
Section § 59-20 of the City's ordinance, entitled "Amount of retirement benefit after twenty years of service," addresses benefits available to a retiree after completing a specified term of employment with the City. See Pawtucket Code § 59-24(B) (referring to service benefit, in contrast to disability benefit, as "normal retirement benefit"). Strikingly similar to the payments offered by the spousal benefit provision, § 59-20 states that a "member of the [retirement] system shall be eligible to retire upon completion of 20 years' credited service in the *Page 30 
amount equal to 50% of the member's salary." These retirement benefits typically "shall be payable commencing on the date of the employee's retirement."
Section § 59-20 presupposes that prior to receiving normal retirement benefits, an employee must first be eligible for benefits based on a specified period of service. See id. at § 59-20 (requiring 20 years' credited service before member "eligible" for normal retirement benefits); see also Park, 893 A.2d at 221 (attributing plain and ordinary meaning to unambiguous statutory language). Subsections 59-24(B) and 59-24(D) of the ordinance also lend support to this interpretation. Each subsection outlines the duration of nonoccupational and occupational disability benefits. Both state that the disability benefit only
 "will continue for the period of such total and permanent disability or, if sooner, until the date upon which the member would have completed 20 years of service and qualified for a service retirement had the member rendered services without interruption, at which time he or she shall be transferred to the retirement list and will receive the normal retirement benefit as if he or she had not been disabled." See id. at §§ 59-24(B) and 59-24(D) (emphasis added).
In this case, Mutter could not have rendered uninterrupted service to the Department but for his disability. In light of his termination, he could not have rendered any service to the Department at all.
This conclusion is bolstered further by our Supreme Court's commentary in Auidi v. Pepin, 417 A.2d 320 (R.I. 1980), a case in which the Court interpreted a former police officer's rights to medical and salary benefits under § 45-19-1.[19] In that case, Auidi received benefits for job-related injuries while serving as a police officer, but six years later, was terminated for cause. Auidi was still receiving the medical benefits when he was terminated. As a result, he asserted *Page 31 
that he was entitled to both salary and medical benefits pursuant to the statute.[20] Id. at 320-21. The Court determined, however, that Auidi was not entitled to salary benefits because, at the time of his demand, he was not eligible to receive a salary. Id. at 321. The Court characterized the statutory provision, which required the municipality to pay an incapacitated police officer salary benefits, as "self-declaratory," and required such payments only if the officer would have been entitled to receive the salary had he not been incapacitated.Id. (emphasis added).
Like the statutory provision relevant to Auidi's benefits, § 59-24 of the ordinance also is self-declaratory. A "normal retirement" benefit will not become available to a member suffering from a disability unless the member would have rendered uninterrupted service to the Department had he not been disabled. See §§ 59-24(B); 59-24(D). A natural consequence of Mutter's termination for violating his LCA was his inability to render uninterrupted service, regardless of his disability. As a result, he was thereafter precluded from receiving any service-based retirement benefits. Instead, once his disability ceased, Mutter would only be able to retrieve the contributions he had placed into the system prior to his withdrawal.
Section 59-18 of the ordinance governs the receipt of a member's contributions to the system that will not be used to support his service retirement. It provides for a refund of any contributions made upon a member's withdrawal from the system "prior to retirement." The ordinance defines a "withdrawal" from service as the "[c]omplete severance of employment of *Page 32 
any member as an employee of the City by resignation, discharge or dismissal." See id. at § 59-15. Consequently, Mutter's involuntary termination would serve as a withdrawal from the system prior to retirement, thereby triggering the refund provision of § 59-18.
As Mutter would not have been able to collect service retirement benefits and, therefore, only was entitled to collect a refund of his contributions to the system under § 59-18, his wife is limited to obtaining the same refund as a surviving spouse. Accordingly, the Court concludes that Karole Mutter is not entitled to any spousal benefits set forth in § 59-26. Ms. Mutter is, however, entitled to receive the refund of her husband's contributions into the pension system pursuant to § 59-18 of the ordinance.
 E Attorney's Fees Costs
Mutter also seeks attorney's fees and costs related to this litigation. It is well-settled that the Court may award attorney's fees in its discretion. "The rule * * * has long been that [attorney's] fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor[e]." Mullowney v. Masopust, No. 2007-34-Appeal, slip op. at 10 n. 6 (R.I., filed Mar. 18, 2008) (citation omitted); see also Mello v. DaLomba, 798 A.2d 405, 410 (R.I. 2002). However, the Court may, in "exercising its inherent power to fashion an appropriate remedy that would serve the ends of justice in this controversy[,]" award counsel fees and expenses. Vincent v. Musone,574 A.2d 1234, 1235 (R.I. 1990).
In his complaint, Mutter cites to § 9-1-45 in support of his request for attorney's fees and costs. This section permits reasonable attorney's fees in breach of contract actions arising from civil actions in which the losing party failed to raise a justiciable issue of either law or fact. It should be noted that Mutter's complaint takes root in equity. Mutter sought declaratory and *Page 33 
injunctive relief in this action. Further, many factual conflicts arose in this case, for which the parties sought resolution in this Court.
Although the Court enjoined the City to provide Mutter with a disability pension, it could not determine that his wife was entitled to spousal benefits. Because both parties prevailed on at least one of their arguments, the Court cannot find that either failed to present a justicable issue of fact or law. While the Court observes that this case presents unique factual circumstances and a long procedural history, it is not inclined to award attorney's fees to Mutter in this matter.
 IV Conclusion
The Court declares, pursuant to its authority under § 9-30-1 etseq., that Mutter has met the requirements set forth in the City's ordinance, which entitle him to nonoccupational disability benefits. The Court, therefore, grants Mutter's request for injunctive relief, and requires that the City issue Mutter a disability pension, retroactive to the date of his initial application. These benefits shall be awarded for the period of May 17, 1999, the date Mutter applied for said benefits, through May 23, 2007, the date of his death. The Court also declares that Karole Mutter, his surviving spouse, is not entitled to the spousal benefits set forth in § 59-26 of the City's ordinance, but will receive a refund of her husband's contributions into the pension system pursuant to § 59-18 of the ordinance.
Counsel shall submit an appropriate order for entry.
[1] Eric Mutter died on May 23, 2007. His surviving spouse, Karole Jean Mutter, as Administratrix of the Estate of Eric Mutter, was substituted as the party in interest by the Court on June 20, 2007. For purposes of this Decision, the terms "Plaintiff" or "Mutter" shall refer to the decedent, Eric Mutter.
[2] Upon his return to work the following Monday, Mutter was disciplined for this failure to report for duty. He was suspended without pay for four days, and required to consent to random drug testing as well as drug and alcohol counseling.
[3] In his affidavit, Mutter asserted that the Department encouraged his rehabilitation even prior to 1997; he stated that he was treated at the expense of the city at Talbot House, Fuller Memorial Hospital, Butler Hospital, and Roger Williams Hospital.
[4] Mutter recollected that this offer occurred on or around September 9, 1997.
[5] Mutter initially stated that his absence resulted from having the flu. Chief Condon documented Mutter's behavior during the time period surrounding his absence in a February 12, 1998 letter to Mayor James E. Doyle. In it, Condon expressed his concern that Mutter had not been honest with him regarding the reason for his absence, particularly stating that he feared Mutter may have been "under the influence." Condon also determined that he would have Mutter submit to a random drug test. An arbitration decision regarding Mutter's eventual termination, however, states that Mutter's test — conducted on or about February 10, 1998 — was negative.
[6] Specifically, Mutter failed to comply with Paragraph (2) of the Last Chance Agreement (LCA), in which he agreed to refrain from using any unlawful controlled substance. Paragraph (9) addressed the procedures by which Mutter would be randomly tested, and subsection (c) authorized Mutter's summary discharge for a positive drug test.See Exhibit 9, Agreed Statement of Facts.
[7] On June 10, 1999, Mayor James E. Doyle (Mayor Doyle), in his capacity as the City's Director of Public Safety, sustained Chief Condon's denial of the Union's grievance on Mutter's behalf. Consequently, the Union filed a June 17, 1999 Demand for Arbitration regarding Mutter's discharge under the Voluntary Arbitration Rules of the American Arbitration Association. The panel entertaining the Union's grievance on Mutter's behalf would later deny Mutter's requested relief on February 8, 2000. The three-member arbitration panel found that the self-executing provision of the LCA, which called for Mutter's summary termination in the event that he tested positive for drugs, coupled with Mutter's positive May 10, 1999 test results for cocaine, constituted just cause for his termination by the City.
[8] After Mutter filed this Complaint, the matter appeared before another Justice of the Superior Court upon the City's motion to stay the action pending arbitration proceedings. On December 1, 1999, the Court denied the stay; it appears that this initial motion was unopposed by Mutter. On December 13, 1999, however, Mutter filed a motion to vacate the stay. After hearing arguments, the Court denied the City's motion for a stay regarding Mutter's pursuit of pension benefits through a process governed by the CBA.
[9] Multiple justices of the Superior Court presided over this action prior to its arrival before the Court for a trial on the merits. For clarity and convenience, the Court will refer to the third justice, before whom this matter appeared three times, as the "Motion Justice."
[10] John Barry, Robert Carr, Donald Grebien, Mary Bray, David Clemente, Raymond Hoyas, Paul Wildenhain, and David Moran are all named in their official capacities as City Council members. Ron Wunschel, the City's Finance Director and Treasurer is also named in this suit. Three of these defendants — Carr, Clemente, and Wildenhain — appear to have voted as members of both the Claims Committee and the City Council against issuing a disability pension to Mutter.
[11] In Bradford Assocs. v. R.I. Div. of Purchases, our Supreme Court recognized that a writ of certiorari is normally the appropriate method of appealing a board's decision when the Administrative Procedures Act (APA) is inapplicable. 772 A.2d 485, 489-90 (R.I. 2001) (citingScolardi v. City of Providence, 751 A.2d 754, 756 (R.I. 2000)). The Court noted, however, that jurisdiction is proper under the UDJA where a statutory method of appeal of a board's decision is not provided or the board is exempted from the APA. Id. at 490 (finding Superior Court had subject matter jurisdiction to examine validity of state board's suspension of contractor through UDJA even though no statutory authority existed for Court to review suspension).
Under the Pawtucket City Charter, the City Council is not a municipal board or an agency, but rather a legislative body. See Pawtucket City Charter § 1-101 (stating "[t]he legislative power of the city . . . shall be exclusively vested in and exercised by a council, except only as limited by the provisions of this Charter."). As a local board, acting only on matters of local concern, possessing no statewide authority, and performing no statewide function, the City Council is exempt from the definition of "agency" under the APA. See G.L. 1956 § 42-35-1; see City of Providence v. Local 799, Int'l Assoc. ofFirefighters, 111 R.I. 586, 589, 305 A.2d 93, 95 (1973). Additionally, Mutter's action is not representative of a "contested case" as would be required by the APA because the City's ordinance nowhere requires a hearing to precede the City Council's determination of whether to issue an applicant a pension. See Pine v. Clark, 636 A.2d 1319, 1324 (R.I. 1994). As a result, the Court will evaluate the rights and responsibilities of the parties involved in this case using the jurisdiction conferred upon it by G.L. 1956 § 9-30-1 etseq.
[12] The City Council is empowered to make rules and regulations to govern the pension list and its disbursements. See Pawtucket code at § 59-13. Although the City's Director of Finance is designated as the pension fund custodian per § 59-7 of the ordinance, he or she has the authority to rebalance the fund portfolio only with Pension Board approval. Further, releasing or adding fund managers would require Finance Committee approval. See Pawtucket Code § 59-31; seeid. at § 59-7 (dictating investment, reinvestment, or altering form of investment requires Finance Committee approval). The Finance Committee is a committee within the City Council. See id. at § 59-7. Thus, the City Council, through its Finance Committee, is involved in ensuring the proper administration of the fund to provide "an actuarially sound pension and retirement system." See Pawtucket Code at § 59-14(A).
[13] Elizabeth Grady initiated contact with Dr. Harrop. Ms. Grady is the Director of Municipal Accounts at The Beacon Mutual Insurance Company, which was the City's agent in this matter. Ms. Grady requested Dr. Harrop's medical opinion as to whether Mutter suffered from depression or anxiety, and if so, whether his condition was work-related or reflective of his personal lifestyle. She also inquired whether any diagnosis of depression or anxiety was disabling, and further, whether such a diagnosis was permanent. In addition, she commented that Mutter had not been involved in any extraordinary work-related incidents.
[14] Doctor Swain is the Clinical Director of Affiliates for Psychotherapy Counseling, Inc., and a Licensed Independent Clinical Social Worker. Doctor Swain noted that the focus of Mutter's treatment with him was for "stress management associated with work, depression, and attention-deficit disorder." In this note dated May 14, 1999, Dr. Swain stated that Mutter "is no longer able to do his job."
[15] The parties have not provided the Court with minutes of the January 21, 2004 meeting or a transcript reflecting the commentary or the vote of the City Council denying Mutter's application. The deposition of Chairman Carr on December 3, 2004, confirms that no discussion took place among City Council members prior to denying Mutter's claim. See Carr, Depo. Tr. at 75-77. Three members that voted to deny Mutter's application on January 21, 2004, also participated in the evaluation of Mutter's application as members of the Claims Committee.
[16] Dr. Harrop's opinion was rendered with the more stringent standard governing Workers' Compensation claims, found within G.L. 1956 § 28-33-1 et seq., in mind. (Harrop, Depo. Tr. at 54.)
[17] The City contends that Mutter outright lied about his drinking habits to Doctors Harrop and Solomon. It should be noted, however, that in his deposition, Mutter was asked whether he had used drugsor alcohol in the hours or days leading up to his May 10, 1999 drug test. Based on his answers that he indeed had used drugs or alcohol, the record cannot support a conclusion that Mutter actually had consumed alcohol after March or April of 1999 as he had reported to Doctors Harrop and Solomon.
[18] The City further argues that the In re Almeida decision should support a finding that Mutter was not entitled to a disability pension because he was terminated for breaching his LCA agreement. 611 A.2d 1375
(R.I. 1992), superseded by statute, Public Employee Pension Revocation and Reduction Act (PEPRRA), G.L. 1956 § 36-10.1-1 et seq., asrecognized in Smith v. Retirement Bd. of the Employees' Retirement Sys.of R.I., 656 A.2d 186, 190 (R.I. 1995). However, the Motion Justice distinguished that case in a November 3, 2006 bench decision with respect to the forfeiture provision of § 59-10 of the ordinance. (Tr. 11/3/06 at 6-7.) It appears, however, that the City uses this case to provide an independent policy reason for Mutter's inability to receive a pension. The Court finds that In re Almeida is inapposite to the resolution of this matter.
Our Supreme Court enunciated in Smith v. Retirement Bd. that "the Legislature clearly intended that only a conviction or a plea of guilty or nolo contendere to one of the felonies enumerated in the [PEPRRA] would trigger the revocation or reduction of a public employee's retirement benefits." 656 A.2d at 190-91 (emphasis in original). Absent one of these occurrences, an employee's pension may not be suspended. Thus, In re Almeida is inapplicable to Mutter's application for a disability pension.
[19] While this particular section is neither identical to the ordinance at hand, nor relevant to the resolution of this matter, the Court recognizes that statutes governing pensions are liberally construed. See Auidi v. Pepin, 417 A.2d 320, 321 (R.I. 1980) (recognizing liberal construction of statute). Therefore, in determining the rights of persons entitled to benefits arising under pension statutes and ordinances, the Court finds these cases applicable when considering the relevant policy considerations underlying the enactment of these provisions.
[20] The relevant provision in Auidi provided as follows:
 "`Salary payment during line of duty illness or injury. — Whenever any police officer * * * of any city * * * shall be wholly or partially incapacitated by reason of injuries received * * * in the performance of his duties, the respective city * * * by which said police officer * * * is employed shall, during the period of such incapacity, pay such police officer the salary or wage to which the said police officer * * * would be entitled had he not been so incapacitated, and in addition thereto shall pay such medical [expenses] * * * for such period as is necessary * * *. In addition, said cities and towns shall pay all similar expenses incurred by a member who has been placed on a disability pension and suffers a recurrence of the injury or illness that dictated his disability retirement. As used in this section, the term `police officer' shall mean and include any chief or other member of the police department of any city or town regularly employed at a fixed salary or wage.'" See Auidi, 417 A.2d at 321 (quoting § 45-19-1) (emphasis in original). *Page 1